**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Christopher HAWTHORNE, also known as Xavier Bratton, Defendant–Appellant.**

**No. 91–2096.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 15, 1992.

Decided Dec. 15, 1992.

ees does not require a different conclusion. *See* *Chamberlain*, 288 U.S. at 343, 53 S.Ct. at 394.

Lloyd Koelker, Kansas City, MO, argued, for defendant-appellant.

Mark A. Miller, Kansas City, MO, argued, for plaintiff-appellee.

Before JOHN R. GIBSON, BEAM, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Christopher Hawthorne appeals from his conviction of possession with intent to distribute crack cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) (1988). Hawthorne entered a conditional guilty plea, and the sole issue before us is the denial of his motion to suppress the crack cocaine that was found when he was detained and his baggage was searched near the Kansas City, Missouri railroad station. Hawthorne makes a three-fold argument: (1) there was an insufficient basis for the police detention; (2) he did not consent to the search of his bag, and (3) if he did consent, it was involuntary. We affirm.

On June 8, 1990, Hawthorne arrived at the Kansas City Amtrak Station on a train from Los Angeles. Detectives Pat Sola and Randy Hopkins, officers in the Drug Enforcement Unit of the Kansas City, Missouri Police Department, had been working the station for at least two months before Hawthorne's arrival, and had stopped eighteen to twenty passengers arriving on trains from Los Angeles. Relying on a "drug courier profile," they looked for Los Angeles passengers who wore "Los Angeles" hats or shirts; appeared nervous and looked around frequently; had unchecked luggage; tried to leave the station quickly either by taxi or calling for one; or handed a taxi driver a piece of paper with an address written on it.

After Hawthorne alighted from the Los Angeles train, Detective Sola noticed him

walking about a pace behind an elderly woman. Sola saw the woman ask Hawthorne if he was from Kansas City. Hawthorne said, "No," and continued to walk with the woman. Sola concluded that the two were not together, but that Hawthorne was trying to appear to be with her. Hawthorne was wearing a green and white striped shirt, blue jeans, and tennis shoes, and was carrying a gym-bag sized flight bag with a shoulder strap. Hawthorne looked around at the people in the station and acted "jittery." Sola followed Hawthorne and the woman as they walked to the parking garage. After the woman met an elderly man, Sola saw Hawthorne come back into the station, but then he lost sight of him. Sola and Hopkins went upstairs to another exit and saw Hawthorne walking rapidly down the street. The detectives got into an unmarked police car and drove in the direction Hawthorne was walking. The detectives saw him enter the Motor Inn Hotel, which was near the Amtrak Station. The detectives entered the hotel lobby and saw Hawthorne make a telephone call. When Hawthorne finished his call, Detective Sola approached him and began to walk beside him toward the front door. Sola asked Hawthorne if he could talk to him, Hawthorne answered, "Yes," and stopped walking. Sola then showed Hawthorne his identification card and said he was a police officer. Sola asked if Hawthorne was staying at the hotel; Hawthorne replied that he was not, and that he had come to Kansas City to visit a cousin. Sola asked to see Hawthorne's train ticket, and Hawthorne showed him a one-way ticket from Los Angeles, California, purchased for cash the day of departure. When Sola asked for identification, Hawthorne said he did not have any with him (Sola later found out that the name on Hawthorne's train ticket—Xavier Bratton—was an assumed name). Sola asked for Hawthorne's cousin's name, and Hawthorne said that her name was Marge but he could not remember her last name.

Sola then asked permission to look in Hawthorne's bag for narcotics, and Hawthorne said, "No." Based on the facts described above, Sola believed Hawthorne was carrying narcotics and decided to detain him. Sola told Hawthorne that he was temporarily detaining him and his bag and was ordering a narcotics detection dog to sniff the bag. Sola and Hawthorne walked out the front door, and Detective Hopkins, who had been watching the encounter from ten to fifteen feet away, followed. Sola took Hawthorne's bag and told him to sit in the front seat of the car. Sola asked Hopkins to order a drug detection dog, which he thought probably would arrive in five to thirty minutes. Hopkins went to the driver's side of the car and ordered the dog, but he was not told how long it would be before the dog arrived. The car door on the passenger side where Hawthorne was sitting was open, Sola stood on the sidewalk next to the door, and the bag was on the ground between Hawthorne and Sola.

Approximately one minute after the dog was ordered, Hawthorne told Sola to "go ahead and look in his luggage because [he] was going to look anyway." Sola told Hawthorne that he did not have to give permission to look in the bag, that he had ordered a dog, and that if the dog alerted to the bag, they would try to get a search warrant for the bag. Hawthorne told Sola to "go ahead and open [the bag]." Sola looked in the bag and, in addition to men's clothing, found an unsealed white plastic bag with a clear plastic bag inside. The bags contained several large round beige rocks that Sola believed were crack cocaine. Sola placed Hawthorne under arrest.

Hawthorne moved to suppress the crack cocaine that was found in his bag. Following an evidentiary hearing, the magistrate judge [1] proposed the findings of fact stated above and recommended that the motion to suppress be denied because Hawthorne consented to the initial conversation, the detention was lawfully based on a reasonable and articulable suspicion of criminal

---

1. The Honorable Calvin K. Hamilton, United States Chief Magistrate Judge for the Western District of Missouri.

activity, the detention was reasonable in scope, and Hawthorne voluntarily consented to the search of his bag. The district court[2] conducted an independent review of the record and applicable law, adopted the magistrate judge's recommendations, and denied the motion to suppress, stating that Hawthorne's voluntary consent was the most crucial aspect of the case. Hawthorne then entered a conditional plea of guilty, expressly reserving the right to appeal his conviction.

### I.

Hawthorne agrees that his initial encounter and conversation with Detective Sola were permissible and that no seizure occurred until after he refused to consent to the search of his bag. Hawthorne argues that at that point, however, Detective Sola did not have a sufficient basis for detaining him and his bag. We must, therefore, determine whether the investigative, *Terry*-type[3] stop of Hawthorne and his bag was supported by a reasonable and articulable suspicion of criminal activity. *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980) (per curiam); *United States v. Campbell*, 843 F.2d 1089, 1093 (8th Cir.1988).

■ As we have previously stated:

The standard of articulable justification required by the fourth amendment for an investigative, *Terry*-type seizure is whether the police officers were aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[ed] suspicion that a crime [was] being committed." ... In assessing whether the requisite degree of suspicion exists, we must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion. "[T]he totality of the circumstances—the whole picture—must be taken into account." ... We may consider any added meaning certain

conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals.... It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt, ... however, the officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a "hunch" or on circumstances which "describe a very broad category of predominantly innocent travelers." ...

*Campbell*, 843 F.2d at 1093–94 (citations omitted) (quoting *United States v. Martin*, 706 F.2d 263, 265 (8th Cir.1983); *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981); *Reid*, 448 U.S. at 440–41, 100 S.Ct. at 2753–54). The findings of the district court as to what the various parties said or did during the encounter are subject to the clearly erroneous standard. *United States v. McKines*, 933 F.2d 1412, 1426 (8th Cir.) (en banc), *cert. denied*, —— U.S. ——, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991). Whether the detention was justified, however, is a question of law to be reviewed de novo. *See id.*

■ In light of these principles, we evaluate the circumstances known to Detective Sola at the time the *Terry*-type stop occurred: (1) Hawthorne arrived on a train from Los Angeles, a known "source" city for drugs; (2) when Hawthorne got off the train, he walked out of the station and into a parking garage about a pace behind an elderly woman and tried to give the impression that they were together; (3) Hawthorne looked all around at the people in the station and appeared "jittery"; (4) after the elderly woman met someone else, Hawthorne came back into the station and left from a different door; (5) Hawthorne was wearing a green and white striped shirt, blue jeans, and tennis shoes; (6) Hawthorne carried a gym-bag sized flight bag and did not have any checked luggage; (7) Hawthorne walked to a nearby hotel to use

---

**2.** The Honorable Howard F. Sachs, United States Chief Judge for the Western District of Missouri took senior status on November 1, 1992.

**3.** *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

a telephone instead of using one in the train station, and Hawthorne was not staying at the hotel; (8) Hawthorne used a one-way ticket that had been purchased for cash on the day of departure; (9) Hawthorne had no identification;[4] and (10) Hawthorne could not remember the last name of the cousin he said he was visiting.

Even when combined with the other facts, we do not believe that failing to check luggage on a train and wearing a green and white striped shirt, blue jeans, and tennis shoes are indicative of criminal activity. We think these facts probably "describe a very broad category of predominantly innocent travelers." *Reid*, 448 U.S. at 440–41, 100 S.Ct. at 2753–54. Nevertheless, the other facts outlined above, when viewed collectively, are sufficient to have aroused a reasonable, articulable suspicion that criminal activity was afoot. Although we are concerned by Hawthorne's allegations that he was singled out because he was a young black male, the relevant facts discussed above are not race-based, and when taken together, they are sufficient to justify a reasonable, articulable suspicion.

Further, Hawthorne's comparison of the facts in this case to those in *United States v. Millan*, 912 F.2d 1014 (8th Cir.1990), is not persuasive. Although there are a few similarities,[5] "each case must be decided on its own facts," and as we stated above, the facts in this case support a reasonable, articulable suspicion that Hawthorne was engaged in criminal activity. *See Reid*, 448 U.S. at 441, 100 S.Ct. at 2754.

■ Having decided that Detective Sola had sufficient grounds for an investigatory stop, we must further determine whether the encounter was reasonable in scope or was transformed into a full-scale arrest before Detective Sola had probable cause. We do not believe an arrest took place until after Detective Sola searched the flight bag and found the crack cocaine, and at that time probable cause existed. *See Michigan v. DeFillippo*, 443 U.S. 31, 35–36, 99 S.Ct. 2627, 2630–31, 61 L.Ed.2d 343 (1979); *Campbell*, 843 F.2d at 1095. The *Terry*-type encounter here was brief and limited to determining whether Hawthorne was carrying narcotics. Detective Sola took Hawthorne's bag, he and Hawthorne walked to the police car, and he told Hawthorne to sit in the front seat. The car's front door was open, Hawthorne was not handcuffed, and Sola stood on the sidewalk in front of the car door. A drug detection

---

4. Contrary to the dissent, we do not hold that lack of identification is per se sufficient to establish a reasonable, articulable suspicion of criminal activity. It is but one factor to be considered with all the circumstances as officers make their determination. Requests for identification are not at all unusual in travel, or even in such purely local and innocent activities as renting a video, purchasing cigarettes or alcoholic beverages, or using a check or credit card to pay for purchases. Likewise, although traveling under an assumed name is not illegal, it can be considered as a factor. *See United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). In *Sokolow*, the defendant did not have a ticket or identification, he told the drug enforcement agents his name was Sokolow, but he was traveling under his mother's maiden name, "Kray," and his telephone number was listed under a different name. *Id.* at 5, 9, 109 S.Ct. at 1584, 1586. Although any one of all the factors the agents considered, including traveling under an alias, did not per se establish a reasonable, suspicion, *id.* at 9, 109 S.Ct. at 1586, the Court found that:

> "innocent behavior will frequently provide the basis for a showing of probable cause," and that "[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." That principle applies equally well to the reasonable suspicion inquiry.

*Id.* at 10, 109 S.Ct. at 1587 (citation omitted).

5. Hawthorne compares the following facts: Millan was stopped in an airport after he got off a flight from California; he carried a garment bag and had no checked luggage; he had a one-way ticket that had been purchased with cash the day before the flight; and he told the officers that he was visiting a cousin, but he could not remember her address or telephone number. 912 F.2d at 1017. Millan, however, did not act "jittery" and look around at the people in the airport; he did not try to appear to be traveling with another person, leave the airport with that person, and then come back in and exit through another door after that person met someone else; he did not leave the airport on foot to go to a hotel, where he was not staying, to use a telephone; he knew his cousin's name; and when asked for identification, he presented a driver's license under the same name as his airline ticket. *See id.*

dog was ordered to sniff the bag, and it probably would have taken from five to thirty minutes for the dog to arrive. Approximately one minute after the dog had been ordered, Hawthorne told Detective Sola that he could look in the bag. Sola searched the bag, discovered the crack cocaine, and then placed Hawthorne under arrest. The detention, therefore, was not unreasonable in scope or intrusiveness and was wholly related to the purpose of determining whether Hawthorne was carrying narcotics. *See United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *United States v. Drinkard,* 900 F.2d 140, 144 n. 6 (8th Cir.1990).

## II.

■ Having concluded that the detention was not an impermissible seizure, Hawthorne cannot contend that his consent to the search of his bag was tainted by an unlawful detention. *See United States v. Mendenhall,* 446 U.S. 544, 558, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980); *Campbell,* 843 F.2d at 1095. Hawthorne consented to the search while he was justifiably detained on reasonable suspicion, and the products of the search are admissible. *Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion); *Campbell,* 843 F.2d at 1095. Nevertheless, Hawthorne argues that the circumstances surrounding his consent were so inherently coercive that the consent to search his bag was not freely and voluntarily given. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973); *Campbell,* 843 F.2d at 1095.

■ The district court concluded that Hawthorne voluntarily consented to the search of his bag. Because the issue of consent is a factual one, we must accept the district court's finding of voluntariness unless it is clearly erroneous. *Schneckloth,* 412 U.S. at 248–49, 93 S.Ct. at 2058–59; *Campbell,* 843 F.2d at 1095. The court's finding in this case is well supported by the record. When Hawthorne first told Detective Sola to look in his bag, Sola explained that Hawthorne did not need

to give permission for the search, that they could wait until the drug detection dog arrived, and then if the dog alerted to the bag, the detectives would try to obtain a search warrant. Hawthorne again told Sola to look in the bag. Hawthorne points to no evidence that he was in any way threatened or coerced. Nor were the circumstances so inherently coercive that they vitiated Hawthorne's consent—Hawthorne was not handcuffed and was sitting in a car with the door open; the bag was lying on the ground; Sola was standing next to the open door on the sidewalk; Hopkins was on the opposite side of the car; both detectives were dressed in casual attire; and the detectives did not display a weapon, read Hawthorne his *Miranda* warnings, or accuse Hawthorne of carrying drugs. Hawthorne's knowledge that a dog sniff and resulting search would inevitably prove incriminating does not mean his consent was involuntary and coerced. *See Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 2388–89, 115 L.Ed.2d 389 (1991); *Campbell,* 843 F.2d at 1096. Based on this evidence, we cannot say that the district court's finding that Hawthorne's consent was valid is clearly erroneous.

We conclude that Hawthorne's right to be free from unreasonable seizure was not violated, and that he voluntarily consented to the search of his bag. The district court therefore properly denied Hawthorne's motion to suppress and we affirm his conviction.

MORRIS SHEPPARD ARNOLD, Circuit Judge, dissenting.

I respectfully dissent from the judgment of the court because I do not see any material difference between this case and *United States v. Millan,* 912 F.2d 1014 (8th Cir.1990). I agree that each case must be decided on its own facts and that the ultimate question is whether the relevant police officers had a reasonable, articulable suspicion that the defendant was engaged in criminal activity. Even if one gives this collection of words the most "liberal" construction that they can reasonably bear, however, I do not think that the detention in this case can survive the test that those words propose. For me, a reasonable sus-

picion cannot arise from facts unless they make it more likely than not that illegal activity is underway. All of the relevant facts here are, to my mind, at best equivocal, that is, they are just as consistent with legal conduct as not. It is particularly distressing that the court holds that not carrying identification can be counted an incriminating circumstance, either by itself or in combination with other relevant matter. This comes perilously close to requiring citizens to carry an internal passport, a device usually associated only with authoritarian governments, left and right, and certainly not with those that value personal liberty, including the right to travel. Nor is *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), which the court cites, of any relevance to this case. In that case, the fact that the defendant did not have identification was discovered after the *Terry* stop and could not therefore have provided any of the factual justification for it. Indeed, the Court did not rely on that fact in any respect.

I know that the court and I are on common ground in believing that if the choice must be made between winning the war on drugs and keeping our bill of rights, it is our sworn duty to choose the latter course. If the war on drugs is to be won, the government must win it without resorting to unconstitutional means.