UNITED STATES of America, Appellee,

v.

Alvin DIXON, also known as Alvin Devon Dixon, Appellant.

No. 94–3055.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 13, 1994.

Decided April 7, 1995.

John Michael Quinn, Kansas City, MO, for appellant.

D. Michael Green, Kansas City, MO, for appellee.

Before MAGILL and BEAM, Circuit Judges, and PIERSOL,[*] District Judge.

BEAM, Circuit Judge.

Law enforcement officers detained Alvin Dixon and his luggage at the Kansas City airport so that "Mike" the drug dog could be summoned to sniff the luggage. Mike "alerted" to the luggage, and Dixon ultimately was charged with possession with intent to distribute phencyclidine (PCP). Dixon filed a motion to suppress, alleging several Fourth Amendment violations, but the district court[1] denied the motion. Dixon entered a conditional plea of guilty, was sentenced, and now appeals the ruling on the motion to suppress. We affirm.

## I. BACKGROUND

On November 26, 1993, Detective Paul Carrill received a telephone tip that a man named Dixon was acting suspiciously near an America West gate of the Kansas City airport. Carrill was told that Dixon would be traveling to Los Angeles and would return after staying just a short time in that city.

To corroborate the tip, Carrill went to the airport and checked the airline's computer for "Dixon." From the computer, he learned that Dixon, at the airport counter, had purchased a round-trip ticket to Los Angeles for $447 cash. Dixon would spend less than twenty-four hours on the ground in Los Angeles, and would return to Kansas City at 5:00 a.m. Dixon had not checked any luggage for the trip. Carrill then searched for the name "Dixon" in the police computer. He located an "Alvin Dixon" with a 1990 Missouri arrest for a narcotics violation. The computer did not provide any disposition for the charge but described Dixon as a black male, six feet tall, 190 pounds, born in 1961.

Carrill and another detective, Braden, went to meet the flight, which had yielded several drug arrests in the past. Among the passengers disembarking, the detectives saw an individual, later determined to be Dixon, who matched the physical description from the police computer and carried only a duffel bag. Dixon bypassed the baggage claim area and proceeded immediately out of the concourse to the taxi stand. There, Carrill displayed his badge, identified himself as a police officer, and asked if Dixon would be willing to talk to him. Carrill testified that Dixon's eyes widened and his breathing increased, but that Dixon agreed to talk.

Carrill first sought to confirm Dixon's identity. Carrill asked to see Dixon's ticket. Carrill testified that Dixon's hands shook as he gave the ticket to Carrill. The ticket was in the name of Alvin Dixon and reflected the itinerary that Carrill had earlier found in the flight computer. Carrill then asked to see some identification. Dixon produced either a Kansas driver's license or a Kansas identification card in the name of Alvin Dixon.

Carrill next questioned Dixon. Carrill asked how long Dixon had been in Los Angeles, to which Dixon replied "a couple of hours." *United States v. Dixon*, No. 93–00172–01–CR–W–3, Mag. Report & Recommendation at 5 (W.D.Mo. Mar. 3, 1994).

* The HONORABLE LAWRENCE L. PIERSOL, United States District Judge for the District of South Dakota.

1. The Honorable Elmo B. Hunter, Senior United States District Judge for the Western District of Missouri, adopting the report and recommendation of Robert E. Larsen, United States Magistrate Judge.

Carrill asked what Dixon was doing in Los Angeles, to which Dixon replied that he was visiting friends. Carrill asked for more information about the friends, but Dixon said that he didn't know their names or the addresses he had visited.

Carrill then re-identified himself as a police officer. He explained that he was looking for narcotics being smuggled through the airport. He asked Dixon for permission to search the duffel bag, but Dixon refused. Carrill informed Dixon that the two detectives were going to detain Dixon and his duffel bag until a drug dog could be brought to the airport to inspect the bag. While Braden placed the call requesting the drug dog, Carrill and Dixon returned to the terminal to wait. Dixon sat in an alcove near the exit, and Carrill stood next to the alcove.

After several minutes, Dixon became agitated and said he wanted to leave. Carrill told Dixon he was being detained until the dog arrived. Some time later, Dixon again attempted to leave, bumping into Carrill as he did so. Dixon returned to his seat when Carrill repeated that they would wait until the dog arrived. Carrill cautioned Dixon not to touch him again. A few minutes later, Dixon stood up, clutching the duffel bag, and said he was going to leave. Dixon shoved Carrill into Braden, and Carrill told Dixon he was under arrest for assaulting an officer. After a brief struggle, the detectives took Dixon and the duffel bag to the sheriff's office. Carrill radioed the dog handler and directed him to go to the sheriff's office as well.

At the sheriff's office, the detectives placed Dixon's bag in a corner of the room. Mike the drug dog was then brought into the room. He gave a positive indication of narcotics by biting and scratching at the bag. A search warrant was obtained, which Carrill executed. Carrill found four soft drink bottles containing a liquid solution which Carrill believed to be PCP. Dixon moved to suppress the fruit of Carrill's search, but the district court found that no Fourth Amendment violations had occurred and denied the motion.

Dixon entered a conditional plea of guilty to the charge of possession with intent to distribute PCP, and now appeals the ruling on his motion to suppress. Urging reversal, Dixon contends that during his encounter with Carrill, he and his duffel bag were "seized" in violation of the Fourth Amendment. In addition, Dixon contends that the government failed to properly establish Mike's qualifications.

## II. DISCUSSION

### A. Seizure Issues

#### 1. Timing of the Seizure

Dixon first contends that he was "seized" prior to his detention. The district court determined that Dixon was not seized until he was detained to wait for the arrival of the drug dog. Whether a seizure occurs is a question of law which we review de novo. *United States v. McKines,* 933 F.2d 1412, 1426 (8th Cir.) (en banc), *cert. denied,* 502 U.S. 985, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991).

Not every contact between law enforcement officers and citizens constitutes a Fourth Amendment "seizure." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1878 n. 16, 20 L.Ed.2d 889 (1968). For example, a seizure does not ordinarily occur when a police officer approaches an individual and asks for identification or asks a few questions. *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). A seizure occurs only if, considering all of the circumstances, a reasonable person would believe that he is not free to leave. *INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984). In addition, for a seizure to occur, there must be either a physical application of force by the officer or a submission to the officer's assertion of authority. *California v. Hodari D.,* 499 U.S. 621, 626–29, 111 S.Ct. 1547, 1550–51, 113 L.Ed.2d 690 (1991); *United States v. Thompkins,* 998 F.2d 629, 633 (8th Cir.1993).

Dixon concedes that his encounter with Carrill was, initially, consensual. The encounter occurred in a public area. Dixon conversed only with Carrill. There is no indication that the detectives used outright coercion or even subtle threats. They did

not, for example, surround Dixon or display their weapons. Although admitting the consensual nature of the encounter, Dixon argues that the encounter ripened into a seizure when Carrill reidentified himself as a law enforcement officer and began questioning Dixon about drugs.

■ We have specifically held that redisplaying a badge and informing an individual that he or she is the focus of a drug investigation are factors in determining whether a seizure exists. *McKines*, 933 F.2d at 1418. However, those factors do not have any "independent significance;" those factors do not, without more, convert a consensual encounter into a seizure. *See id.* Given the lack of any other even mildly coercive tactics in the present case, we conclude that Dixon was not seized until Carrill informed him that he would be detained until the arrival of the drug dog.

## 2. Nature of The Seizure

■ Dixon next contends that his detention was a *de facto* arrest. The district court determined that the detention was an investigative stop. Whether a particular seizure amounted to an arrest is a question of law which we review de novo. *United States v. Bloomfield*, 40 F.3d 910, 916 (8th Cir.1994) (en banc), *cert. denied*, —— U.S. ——, 115 S.Ct. 1970, 131 L.Ed.2d 859 (1995). *See United States v. Mendenhall*, 446 U.S. 544, 551–52 n. 5, 100 S.Ct. 1870, 1875–76, 64 L.Ed.2d 497 (1980).

■ Seizures fall into two categories: investigative stops and arrests. There is no bright line of demarcation between the two. *United States v. Miller*, 974 F.2d 953, 957 (8th Cir.1992). In distinguishing between a stop and an arrest, we consider the length of the detention and the conduct of the law enforcement officers. *Bloomfield*, 40 F.3d at 916–17. An investigative stop must be temporary and must last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983) (plurality). Similarly, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* If the detention lasts too long, or if the officers' conduct is too intrusive, then the stop is converted into an arrest. *See Bloomfield*, 40 F.3d at 916–17.

■ It is undisputed that Dixon's detention was at least an investigative stop. The issue here is whether the detention rose to the level of an arrest. Dixon argues that the detention was an arrest because the detectives detained not only Dixon's duffel bag but also his person.[2] Dixon cites us to numerous airport stop cases in which the suspect was dispossessed of his luggage but was allowed to leave. As we understand Dixon's use of these cases, he is arguing that Carrill did not use the least intrusive means[3]—dispossession—to verify or dispel his suspicions, thus exceeding the scope of an investigative stop and converting the detention into an arrest. We disagree.

■ Dispossession intrudes on a traveler's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary. *United States v. Place*, 462 U.S. 696, 708, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983). A detention of a traveler's property is subject to the same standards as a detention of a person. *Id.* at 708–

---

2. Dixon makes two additional arguments, which we find to be without merit. First, Dixon argues that he was arrested because a reasonable man in his position would not have felt free to leave. Whether a reasonable person would feel free to leave determines whether a seizure exists; it does not determine the characterization of that seizure as either an investigative stop or an arrest. Second, Dixon argues that Carrill curtailed his freedom "to a degree associated with custodial arrest." Appellant's Brief at 25. Dixon cites two cases, neither of which are on point, and fails to discuss any facts which tend to establish a custodial arrest.

3. We note in passing that the continued validity of the "least intrusive means" test, announced by a plurality in *Royer* but skirted in subsequent Supreme Court cases, see *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), is a matter of some question. *See generally*, 3 Wayne R. LaFave, *Search & Seizure* § 9.2(f), at 387–92 (2d ed. 1987). Nevertheless, this circuit continues to employ this test. *See Bloomfield*, 40 F.3d at 916.

09, 103 S.Ct. at 2645–46. Although travelers are often grateful simply to arrive at their destination, with or without their luggage, the contents of a travel bag may be necessary to, or even the reason for, the trip.

Carrill detained Dixon and his duffel bag only to wait for the drug dog, which would verify or dispel Carrill's suspicions. But for Dixon's assault on Carrill, the detention probably would have lasted no longer than twenty minutes. Report & Recommendation at 11. We conclude that Dixon was not subjected to a *de facto* arrest. The district court properly characterized Dixon's detention as an investigative stop.

### 3. Justification for the Seizure

Dixon next argues that the investigative stop was not justified by a reasonable suspicion that criminal activity was afoot. The district court found that Carrill had the requisite reasonable suspicion. The standard of review for this issue is a matter of some confusion. On some occasions, we have suggested that de novo review is appropriate. *See, e.g., United States v. McMurray,* 34 F.3d 1405, 1409 (8th Cir.1994) (on a motion to suppress, application of law to facts is reviewed de novo), *cert. denied,* — U.S. —, 115 S.Ct. 1164, 130 L.Ed.2d 1119 (1995); *United States v. Hawthorne,* 982 F.2d 1186, 1189 (8th Cir.1992) (justification for seizure is reviewed de novo). On other occasions, we have suggested that clear error review is appropriate. *See, e.g., United States v. Clapp,* 46 F.3d 795 (8th Cir.1995) (ruling on motion to suppress is reviewed for clear error); *United States v. Lloyd,* 36 F.3d 761, 763 (8th Cir.1994) (finding of reasonable suspicion is reviewed for clear error), *cert. denied,* — U.S. —, 115 S.Ct. 1325, 131 L.Ed.2d 205 (1995).

These seemingly divergent standards are not entirely inconsistent. In *United States v. Campbell,* 843 F.2d 1089 (8th Cir.1988), we explained the relationship between de novo review and clear error review in the context [4] of justifying a Fourth Amendment seizure:

> Whether reasonable suspicion or probable cause exists to justify a seizure is a mixed question of fact and law. The findings with respect to the historical facts are reviewed under the clearly erroneous standard; the ultimate conclusion, however, is subject to *de novo* review.

*Id.* at 1092. In the present action, the district court's factual findings are not disputed on appeal. The issue for our review is whether the facts as found by the district court amount to "reasonable suspicion." Based on the foregoing, we review the district court's determination de novo.

An investigative stop is constitutionally impermissible unless the officer has a reasonable suspicion, based on articulable facts, that criminal behavior is afoot. *Bloomfield,* 40 F.3d at 916. In determining whether the stop was justified because reasonable suspicion existed, a court must consider the totality of the circumstances surrounding the stop in light of the officer's experience. *Id.* at 918.

The line between unjustified and justified investigative stops in airports has been drawn, at least partly, by our decisions in *United States v. White,* 890 F.2d 1413 (8th Cir.1989), *cert. denied,* 498 U.S. 825 (1990), and *United States v. Weaver,* 966 F.2d 391 (8th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 829, 121 L.Ed.2d 699 (1992). *White* represents the unconstitutional side of the line. *Weaver* represents the constitutional side.

---

**4.** We wish to emphasize the importance of context for standards of review. Our opinions often repeat the proposition that this court reviews the factual findings as to what the parties said and did for clear error, while we review the district court's conclusion that the Fourth Amendment was or was not violated de novo. *See, e.g., Bloomfield,* 40 F.3d at 918. While this statement is not incorrect, neither is it precise. The Fourth Amendment can be violated in numerous ways, and we do not suggest that all of these violations are subject to de novo review. For example, when a magistrate judge rules that the sworn facts in a warrant application provide probable cause to issue a search warrant, de novo review is inappropriate: "[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for ... concluding that probable cause existed." *Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (internal quotations and brackets omitted).

In *White*, the defendant arrived from a source city for drugs, early in the morning, on a flight that had yielded drug arrests in the past. White behaved nervously as he proceeded through the terminal, with his shoulder bag, to the baggage claim area. When stopped by law enforcement officers, White readily produced his ticket and identification, but his hands shook as he did so. These documents revealed that White had traveled under his own name and had paid for his one-way ticket with cash.[5] One officer testified that he believed White was answering questions truthfully. Based on the totality of these circumstances, we held that the officers lacked the requisite reasonable suspicion.

In *Weaver*, the defendant also arrived from a source city for drugs, early in the morning. Weaver had not checked any baggage. He disembarked from the plane carrying two bags and walked briskly toward the taxi stand. When stopped by law enforcement officers, Weaver appeared nervous and was unable to produce either his ticket or any identification. Weaver said that he needed to catch a taxi to visit his mother in a hospital, whereupon the officers decided to detain Weaver's bags. Based on the totality of these circumstances, we held that the officers had reasonable suspicion.

■ Dixon's circumstances are a combination of those in *White* and *Weaver*. Like White, Dixon arrived from a source city for drugs, early in the morning, on a flight which had yielded drug arrests in the past. When stopped by officers, Dixon, like White, produced his ticket and identification. Again like White, Dixon had traveled under his own name and had paid for his ticket with cash. Unlike White, but like Weaver, Dixon checked no luggage, held a carry-on bag, and walked directly from the gate to the taxi stand. In addition, Dixon did not remember the names or addresses of friends who he claimed to have visited on his trip, a memory lapse roughly equivalent, as suspicious circumstances go, to Weaver's belated reference to his mother in the hospital. Furthermore, Dixon's layover lasted less than twenty-four hours. Finally, in 1990 in Missouri, a man of Dixon's name and physical description had been arrested on a drug charge.

In light of *White* and *Weaver*, we conclude that Dixon's detention was constitutional. The circumstances of Dixon's detention exceed the benchmark set by *White* because Dixon had made a very brief trip, had not checked any baggage, could not answer all of the officers' questions, and was thought to have been previously arrested on a drug charge. The district court properly found that the investigative stop of Dixon was justified by reasonable suspicion.[6]

## B. Canine Issues

Finally, Dixon contends that the government did not sufficiently demonstrate Mike the drug dog's qualifications.[7] In considering this contention, it is important to recall the role Mike played in Dixon's case. The officers did not have probable cause to search Dixon's duffel bag until Mike sniffed the bag and alerted, signalling the presence of narcotics. Armed with probable cause, the officers sought and obtained a search warrant, searched Dixon's duffel bag, and discovered the PCP. Because Mike's alert functioned only to provide probable cause for the search warrant, Dixon's contention is really a challenge to the issuance of the search warrant. Unfortunately for Dixon, he is barking up the wrong tree.

■ Dixon did not challenge the issuance of the warrant below. The magistrate judge's report states that Dixon "does not challenge the sufficiency of the warrant or the propriety of its execution." Report and

---

5. In comparing *White*'s circumstances to those in *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), we stated that White's payment in cash was no more suspicious than Reid's twenty-four hour layover. We note that in the present case, Dixon both paid cash and had a layover of less than twenty-four hours.

6. Dixon also argues that the seizure of his luggage was unconstitutional. This argument only applies when the individual and his luggage are

treated differently, that is, when one is seized and the other is not. In the present action, because the luggage was subject to the same seizure as Dixon and because we have found Dixon's seizure constitutional, the seizure of the luggage was likewise constitutional.

7. Specifically, Dixon argues that Mike was not qualified to detect PCP. We express no opinion on this issue.

Recommendation at 12. Dixon's objections to the report do not mention either Mike's qualifications or the search warrant.

Having failed to raise these matters before the district court, Dixon has waived his right to have them considered by this court. *See Roth v. G.D. Searle & Co.,* 27 F.3d 1303, 1307 (8th Cir.1994); *Kramer v. Kemna,* 21 F.3d 305, 308 (8th Cir.1994). With certain exceptions not relevant here, this court does not decide issues which were not presented to and adjudicated by the district court. *See Thompson v. Brule,* 37 F.3d 1297, 1301–02 (8th Cir.1994). Accordingly, we decline to consider Dixon's argument concerning Mike's qualifications.

## III. CONCLUSION

Dixon's initial encounter with Detective Carrill was consensual. The consensual encounter became a seizure when Carrill detained Dixon to wait for the drug dog. The seizure, an investigative stop, was justified by Carrill's reasonable suspicion that criminal activity was afoot. The investigative stop became an arrest based upon probable cause when Dixon assaulted Carrill. Thus, we conclude that no Fourth Amendment violation occurred. The decision of the district court denying Dixon's motion to suppress is affirmed.