UNITED STATES of America, Appellee,

v.

Andrew DELANEY, Appellant.

UNITED STATES of America, Appellee,

v.

Africa SWEENEY, Appellant.

Nos. 94–2232, 94–3011.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 10, 1995.

Decided April 11, 1995.

W. Russell Bowie, Omaha, NE, for Delaney.

Lawrence G. Whelan, Omaha, NE, for Sweeney.

Michael G. Heavican, Asst. U.S. Atty., Omaha, NE (Laurie Johnston, on the brief), for appellee.

Before BOWMAN, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

WOLLMAN, Circuit Judge.

Africa Sweeney appeals from his conviction following his conditional guilty plea to conspiracy to distribute and to possess with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 846, 841(a)(1). He argues that the district court[1] erred in adopting the report and recommendation of the magistrate judge[2] and denying his motion to suppress evidence. Andrew Delaney appeals from his sentence after pleading guilty to the same conspiracy charge. We affirm the conviction and sentence.

## I.

On May 12, 1993, Officer Barry DeJong of the Omaha, Nebraska Police Department received a phone call from a Drug Enforcement Administration (DEA) agent in Los Angeles, California. The DEA agent informed DeJong that a man known as R. Wilson was traveling from Los Angeles to Omaha and had been observed in the Los Angeles airport exhibiting characteristics consistent with those of a drug courier. According to the DEA agent, the man had purchased his ticket with cash from a travel agent just one hour before the flight; he was seen pacing nervously while waiting to board the plane and approached the gate three different times before actually boarding; and he did not check any luggage or carry any luggage onto the plane. The DEA agent gave DeJong a full description of the individual. Acting on the call, Officer DeJong confirmed that a flight from Los Angeles would be arriving in Omaha later that day and that a passenger named R. Wilson was on board. Thereafter, Officers DeJong and Henry and Sergeant Sorys, all of the Omaha Police Department, went to the Omaha airport to await the arrival of the plane.

At the airport, the officers observed Sweeney disembark from the plane and noticed that he matched the description given by the DEA agent. Sweeney was initially observed walking and conversing with an older woman, but as the passengers walked through the main terminal he stepped away and began walking along the wall of the terminal. Officer DeJong and Sergeant Sorys approached Sweeney as he was walking through the main terminal, identified themselves as police officers, and asked if they could speak with him. Sweeney agreed. The officers did not block

---

1. The Honorable Lyle E. Strom, Chief Judge, United States District Court for the District of Nebraska.

2. The Honorable Kathleen A. Jaudzemis, United States Magistrate Judge for the District of Nebraska.

Sweeney's passage or take his ticket, nor did they immediately stop or detain him. Officer DeJong asked Sweeney whether he was R. Wilson. Sweeney, after stuttering, responded affirmatively. DeJong asked Sweeney whether R. Wilson was his correct name. After again pausing, Sweeney said that it was not and that his real name was Africa Sweeney. DeJong then told Sweeney that the officers were conducting a narcotics investigation and that they suspected that he was carrying drugs. Sweeney interrupted and volunteered to be searched. Before searching him, however, Officer DeJong asked to see Sweeney's airline ticket. DeJong verified that the ticket was issued in the name of R. Wilson and then returned it to Sweeney.

Officer DeJong and Sergeant Sorys escorted Sweeney to a rest room to conduct the search. Sweeney was asked whether he had any luggage, and he responded that he had a black leather suitcase. After Sweeney had signed a consent-to-search form, DeJong conducted a pat-search but found no contraband or identification. He did find, however, a piece of paper upon which was written a name and phone number, coins but no currency, and a digital pager. DeJong returned these items to Sweeney, who then agreed to accompany the officers to the baggage claim area.

At the baggage claim area, Sweeney kept a constant watch on the exit door and appeared to be very nervous. He did not stand still and he made rapid hand gestures. While waiting for the luggage to arrive, Sweeney was unable to focus his attention, and Officer DeJong had to ask him the same question more than once. When the baggage began arriving on the carousel, DeJong asked Sweeney to identify his luggage. Sweeney replied by pointing to a blue bag tied with a green bow, stating that the bag was his. He allowed the bag to pass by him, however, and it was subsequently retrieved by another passenger. When told by Officer DeJong that he thought that Sweeney had a black leather suitcase, Sweeney did not respond and acted even more nervous.

After everyone had left the baggage claim area, a black tweed suitcase and a duffle bag remained on the baggage carousel. A porter removed these items from the carousel and placed them on the floor. Sweeney was then asked which piece of luggage was his. He responded by saying that the duffle bag might be his and that the officers could search it. Officer DeJong unzipped the bag and found certain items indicating that the bag did not belong to Sweeney. Sergeant Sorys verified that no luggage had been reported lost and then took the suitcase and the duffle bag to the airport security office.

Meanwhile, Sweeney asked DeJong if he could use the rest room. Officers DeJong and Henry then accompanied Sweeney back to the rest room. Once inside, Henry stayed at the door while DeJong escorted Sweeney to a stall. DeJong then pat-searched Sweeney again and told him that, while he could close the door of the stall, he was not to lock the door or flush the toilet. Despite DeJong's instruction, Sweeney locked the door upon entering the stall. DeJong told Sweeney to unlock the door and observed him through the gap between the stall door and the wall of the stall. As Sweeney unlocked the door, DeJong saw him drop his airline ticket between his legs and flush the toilet. Officer DeJong then entered the stall and retrieved the ticket from the toilet.

After exiting the rest room, Sweeney agreed to accompany Officers DeJong and Henry to the airport security office. There, Officer Henry examined the airline ticket and found that a number on the ticket matched the luggage number on the black tweed suitcase. Approximately thirty minutes later, a drug detection dog arrived. The dog alerted to both the suitcase and the duffle bag. Sweeney was then advised that he was not free to leave. The officers thereafter obtained a search warrant and searched both pieces of luggage. It was discovered that the duffle bag did not contain any drugs and that it did not belong to Sweeney. The suitcase, however, contained a box of detergent. Inside the box, the officers discovered eleven ounces of crack cocaine. Sweeney was then arrested. He then immediately implicated Delaney in a conspiracy to distribute the cocaine. Delaney was later arrested when

he attempted to pick up Sweeney from the airport.

Sweeney and Delaney were subsequently indicted by a federal grand jury. The district court denied Sweeney's motion to suppress the evidence seized, accepting the magistrate judge's findings that the encounter between Sweeney and the Omaha police officers and the subsequent search for and seizure of cocaine did not violate Sweeney's rights under the Fourth Amendment. Sweeney thereafter conditionally pled guilty, reserving his right to appeal the denial of his motion to suppress. The district court, after granting the government's motion to depart based on Sweeney's substantial assistance, sentenced Sweeney to thirty-three months' imprisonment, with a five year term of supervised release and a $50 assessment. Delaney likewise pled guilty to the same charge. The district court denied Delaney's motion for a downward departure and sentenced him to a term of 168 months' imprisonment, with a five year term of supervised release and a $50 assessment.

## II.

### *Africa Sweeney*

■ Sweeney asserts several challenges to the district court's denial of his motion to suppress. We review the denial of a motion to suppress for clear error. *United States v. Ward,* 23 F.3d 1303, 1305 (8th Cir.1994). We will affirm the district court's decision unless it is unsupported by substantial evidence or is based on an erroneous interpretation of applicable law, or, in light of the entire record, we are left with a firm conviction that a mistake has been made. *Id.* Whether a seizure occurred, however, is a question of law that we review *de novo*. *United States v. McKines,* 933 F.2d 1412, 1426 (8th Cir.) (en banc), *cert. denied,* 502 U.S. 985, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991). The ultimate conclusion whether the Fourth Amendment has been violated is also a question of law subject to *de novo* review. *United States v. Hernandez,* 854 F.2d 295, 297 (8th Cir.1988).

### A.

We turn first to Sweeney's argument that he was seized within the meaning of the Fourth Amendment when Officer Dejong and Sergeant Sorys initially approached him in the main terminal of the airport. He contends that the seizure occurred without a reasonable suspicion of criminal activity. *See Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam). Thus, he argues, his consent to being searched was a tainted fruit of this illegal seizure.

■ Not all personal contacts between policemen and citizens involve seizures. *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). There is no seizure when a police officer approaches an individual and merely questions him or asks to examine his identification, so long as the officer does not convey a message that compliance with his requests is required. *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). A seizure occurs only when, viewing all the circumstances surrounding the encounter, "the police conduct would have communicated to a reasonable person that he was not free to decline the officer's request or otherwise terminate the encounter." *United States v. Angell,* 11 F.3d 806, 809 (8th Cir. 1993) (citing *Bostick,* 501 U.S. at 435, 111 S.Ct. at 2386–87), *cert denied,* — U.S. —, 114 S.Ct. 2747, 129 L.Ed.2d 865 (1994).

■ We agree with the district court that Sweeney was not seized when Officer DeJong and Sergeant Sorys initially questioned him in the airport terminal. The officers approached Sweeney but did not prevent him from continuing to proceed through the terminal. They did not use threatening language or display any weapons, nor did they physically touch Sweeney. Because the initial encounter with Sweeney did not constitute a seizure, no reasonable suspicion on the part of the officers was required.

Sweeney nevertheless contends that the encounter soon escalated into a seizure once the officers informed him that they were conducting a narcotics investigation and that they suspected him of carrying drugs. He claims that, at that point, no reasonable person would have felt free to terminate the encounter.

We rejected such a bright-line approach in *United States v. McKines,* 933 F.2d at 1417–18. Rather than adopting any per se rules, we concluded that the inquiry must focus on whether the officers' questioning was "so intimidating, threatening or coercive that a reasonable person would not have believed himself free to leave." *Id.* at 1419. We need not address this issue again here, however, because even assuming that the officers' peremptory language transformed the encounter into a seizure, we nonetheless conclude that the officers had a reasonable suspicion for conducting an investigative stop. *See United States v. Hernandez,* 854 F.2d 295, 298 (8th Cir.1988).

■■■■ Police officers may, without a warrant, briefly stop and ask questions of persons whom they reasonably suspect of criminal activity. *Terry,* 392 U.S. at 20–23, 88 S.Ct. at 1879–81; *United States v. Weaver,* 966 F.2d 391, 393 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 829, 121 L.Ed.2d 699 (1992). For an investigative stop to be valid, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. Although the degree of suspicion required is less than probable cause, it must be more than just an "unparticularized suspicion or 'hunch.'" *Id.* at 27, 88 S.Ct. at 1883.

■■■■ At the time the officers advised Sweeney that they were conducting a narcotics investigation and that they suspected him of carrying drugs, the officers had been informed or were aware of the following: (1) Sweeney was traveling on a flight from Los Angeles, a known source city for drugs; (2) he had purchased his ticket with cash, checked no luggage, and did not have any carry-on luggage; (3) he acted very nervous before boarding the plane and later while officers were questioning him; (4) he was traveling under an assumed name; and (5) he lied about using an alias. These factors were sufficient to provide the officers with a reasonable suspicion of criminal activity. *See, e.g., United States v. Sokolow,* 490 U.S. 1, 8–10, 109 S.Ct. 1581, 1585–87, 104 L.Ed.2d 1 (1989) (relying on similar facts to find reasonable suspicion); *United States v. Hawthorne,* 982 F.2d 1186, 1189–90 (8th Cir.1992) (same); *Hernandez,* 854 F.2d at 298 (same). Accordingly, we hold that even if the encounter was transformed into an investigative stop, it was justified by an articulable, reasonable suspicion that Sweeney was carrying drugs. Because Sweeney volunteered to be searched "while he was justifiably detained on reasonable suspicion, ... the products of the search are admissible." *Hawthorne,* 982 F.2d at 1191.[3]

## B.

■■■■ Sweeney next argues that the officers had no reasonable suspicion to justify the seizure of his luggage. We do not agree. We have already found that the officers had a reasonable suspicion to detain Sweeney's person. The factors supporting that conclusion remain fully applicable here. In addition, after the officers discovered that Sweeney was traveling with a suitcase, had no identification, and was carrying a pager, and after Sweeney had twice misidentified his luggage at the baggage carousel, the officers were justified in maintaining their reasonable suspicion and applying it with equal force to Sweeney's luggage. *See United States v. Place,* 462 U.S. 696, 706, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983). Accordingly, we hold that the officers' seizure of Sweeney's luggage was supported by a reasonable suspicion that the luggage contained contraband.

## C.

Sweeney argues that Officer DeJong's observation of him while he was in the rest

---

**3.** Ordinarily, a finding that there was no illegal seizure prior to an otherwise consensual search would end the inquiry. *See Hawthorne,* 982 F.2d at 1191. In this case, however, the magistrate judge made no factual findings as to the scope of the consent, nor did the magistrate judge consider the relevance of the consent with respect to the subsequent seizure and search of Sweeney's suitcase. The officers testified that Sweeney signed a consent form in which he agreed to a search of his person and suitcase. Sweeney testified, however, that he consented only to the initial search of his person. Because of this unresolved conflict, we must assume that the scope of Sweeney's consent extended only to the initial search of his person in the rest room.

room stall and DeJong's subsequent entry into the stall constituted an improper search without a warrant or probable cause. Consequently, he maintains that the seizure of the airline ticket from the toilet was fatally tainted by the unlawful search.

A person claiming to have suffered from an unlawful search must first establish as a threshold matter that he had a legitimate expectation of privacy in the particular area searched. *Rakas v. Illinois*, 439 U.S. 128, 148–49, 99 S.Ct. 421, 433, 58 L.Ed.2d 387 (1978). An expectation of privacy is legitimate only where "(1) the individual manifests a subjective expectation of privacy in the object of the challenged search; and (2) society is willing to recognize that subjective expectation as reasonable." *United States v. Pinson*, 24 F.3d 1056, 1058 (8th Cir.) (citing *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)), *cert. denied*, —— U.S. ——, 115 S.Ct. 664, 130 L.Ed.2d 598 (1994).

We have recognized that an occupant of a toilet stall in a public rest room may have a reasonable expectation of privacy against clandestine police surveillance of the interior of the stall. *United States v. White*, 890 F.2d 1012, 1015 (8th Cir.1989), *cert. denied*, 497 U.S. 1010, 110 S.Ct. 3254, 111 L.Ed.2d 763 (1990). That expectation, however, is not absolute. *Id.* In *White*, the officer, unbeknownst to the defendant and without peering in a "knothole fashion" or looking under or over the stall door, observed the defendant from a distance by observing what she could through the gap between the bathroom stall door and the wall of the stall and by looking through the gap via reflections in the bathroom mirror. We held that although the defendant "could reasonably expect a significant amount of privacy in the bathroom stall, [that] expectation was not violated ... because the design of the stall allowed the officer to make her observations without placing herself in any position that would be unexpected by an occupant of the stall." *Id.*

Likewise, we conclude here that the officer's actions in observing Sweeney in the rest room did not violate any legitimate expectation of privacy. Officer DeJong observed Sweeney by looking through the gap between the rest room stall and the wall of the stall. The test for legitimacy is whether a person's subjective expectation is " 'justifiable' under the circumstances." *United States v. Knotts*, 460 U.S. 276, 281, 103 S.Ct. 1081, 1085, 75 L.Ed.2d 55 (1983) (quoting *Katz*, 389 U.S. at 353, 88 S.Ct. at 512). Here, unlike the situation in *White*, there was no clandestine or surreptitious police surveillance of Sweeney in the airport rest room. At the time Sweeney asked to use the rest room, he was the subject of a lawful investigative stop. Officer DeJong escorted Sweeney to the stall and, as a result of the detention, was standing in a position where he had a legal right to be. Furthermore, DeJong specifically instructed Sweeney not to lock the door or flush the toilet. Sweeney was surely aware that DeJong was standing just outside the stall to ensure compliance with those instructions. Given these circumstances, Sweeney had no subjective expectation of privacy in the stall.

### D.

Finally, Sweeney argues that the district court erred in finding that the search warrant for the luggage was supported by probable cause. The sole basis for this contention is that the affidavit supporting the warrant did not include information concerning the reliability of the drug detection dog.

Although "there is no legal requirement that [an] affidavit specify the number of times the dog previously has sniffed out drugs," *United States v. Maejia*, 928 F.2d 810, 815 (8th Cir.1991), the affidavit in this case stated that the dog was certified in detecting cocaine and other drugs and, since February 1990, had alerted more than fifty times in situations where narcotics were located. The affidavit also stated that the dog's handler was a certified drug canine handler and had received seventy-six hours of training in drug dog handling. This information sufficiently established the dog's reliability and provided a substantial basis for concluding that there was a fair probability

that drugs would be found in the luggage. *Id.*

### III.

*Andrew Delaney*

 In appealing his sentence, Delaney argues only that the 100–to–1 ratio between crack cocaine and cocaine penalties has a disproportionate impact on blacks and therefore violates his equal protection rights under the Fifth Amendment. We have repeatedly considered and rejected claims that the 100–to–1 ratio violates equal protection of the laws or that it serves as a basis for departure. *See, e.g., United States v. Clary,* 34 F.3d 709, 713–14 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1172, 130 L.Ed.2d 1126 (1995); *United States v. Maxwell,* 25 F.3d 1389, 1396–97, 1401 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 610, 130 L.Ed.2d 519 (1994). Accordingly, we reject Delaney's challenge to his sentence.

The conviction and sentence are affirmed.