Therefore, in accordance with the foregoing memorandum,

**IT IS HEREBY ORDERED** that petitioner's motion for evidentiary hearing [Doc. # 27] is denied.

UNITED STATES of America,
Plaintiff,

v.

Gregory A. NEEMANN, Defendant.

No. 4:97CR3010.

United States District Court,
D. Nebraska.

March 16, 1999.

Brent M. Bloom, Jerold V. Fennell, Domina Law Office, Omaha, NE, for Gregory A. Neemann.

Sara E. Fullerton, Assistant United States Attorney, Lincoln, NE, for U.S. Attorneys.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This matter is before the court on the Magistrate Judge's Report and Recommendation (filing 80) and the objections to such Report and Recommendation (filings 84) filed as allowed by 28 U.S.C. § 636(b)(1)(C) and NELR 72.4.

I have conducted, pursuant to 28 U.S.C. § 636(b)(1) and NELR 72.4, a de novo review of the portions of the Report and Recommendation to which objection has been made. As Judge Piester has carefully and correctly found the facts and applied the law, I need only state that the Report and Recommendation should be adopted and Defendant's motion to suppress, (filing 54), must be denied.

Accordingly,

IT IS ORDERED:

1. the Magistrate Judge's Report and Recommendation (filing 80) is adopted;

2. Defendant's objections (filing 84) are overruled; and

3. Defendant's motion to suppress (filing 54), is denied.

## MEMORANDUM, ORDER AND RECOMMENDATION

PIESTER, United States Magistrate Judge.

In a superseding indictment filed on June 17, 1997 the defendant, Gregory A. Neemann, was charged with two counts of willfully and knowingly possessing with intent to distribute methamphetamine, in violation of 18 U.S.C. § 841(a)(1), one count of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. § 846, and one count of criminal forfeiture, in violation of 21 U.S.C. § 853. (Filing 16). Defendant has filed a motion to suppress evidence obtained as a result of the unlawful search of his vehicle on February 6, 1997, as well as his subsequent statements to police. (Filing 54). In his motion defendant also argues that police unlawfully detained him and unlawfully searched his vehicle on February 26, 1997, and therefore any evidence seized as a result of the unlawful detention and search must be suppressed. On September 18, 1998 and January 22, 1999 a hearing was held before me on the motion. For the reasons set forth below, I conclude that defendant's motion to suppress should be denied in its entirety. I shall so recommend.

### BACKGROUND

*February 6, 1997*

On February 6, 1997 Charles LaFollette, a Deputy United States Marshal, was engaged in surveillance of a home located in the 4700 block of North 70th Street in Lincoln, Nebraska. (Transcript of Sept. 18, 1998 Suppression Hearing, Filing 62, at 5:6–18). The purpose of the surveillance was to locate Richard Maher, who was wanted for violating the conditions of his pretrial release. (*Id.* at 5:9–25). To aid in his identification of Richard Maher, LaFollette had a picture of him while on surveillance. (*Id.* at 16:9–16). At approximately 6:30 p.m. LaFollette saw two people leave the residence and enter a vehicle. (*Id.* at 6:7–7:22). LaFollette testified that he be-

lieved that the passenger in the vehicle was Richard Maher; however, because it was dark, he was a block to a block and half away from the home, and the passenger had a hat on, LaFollette could not tell for certain if the passenger was Mr. Maher. (*Id.*) Nor could LaFollette be certain after the vehicle passed by the car LaFollette was in. (*Id.* at 7:18–22). Nevertheless, LaFollette radioed the Lincoln Police Department and requested a marked cruiser and a uniformed officer to stop the vehicle. (*Id.*)

In response to a dispatch, two uniformed Lincoln police officers, Officers Clark Wittwer and Steven Niemeyer, in separate cruisers, stopped defendant's vehicle. (*Id.* at 71:4–13). Officer Wittwer testified that at the time he stopped the vehicle, he knew only that an arrest warrant had been issued for one of the occupants of the vehicle; he did not know the name of the individual. (*Id.* at 70:13–71:2). Officer Wittwer exited his vehicle and approached the passenger side of the vehicle; as he was doing so, LaFollette was right behind him. (*Id.* at 73:18–74:18). Officer Niemeyer approached the driver side of the vehicle. (*Id.* at 73:20–22). Officer Wittwer then asked the passenger to exit the vehicle. The passenger did. (*Id.* at 73:25–74:4). Officer Wittwer testified that at some point, although he could not remember exactly when, he asked the passenger for identification, to which the passenger replied that he did not have any

identification with him. (*Id.* at 82:2–6). The passenger did tell Officer Wittwer that his name was Gary Borland. (*Id.* at 82:7–10). Contrary to Wittwer's testimony, LaFollette testified that at the time he approached the passenger and Officer Wittwer, Officer Wittwer already had the passenger's driver's license. (*Id.* at 11:21–25). LaFollette testified that he compared the driver's license and the passenger with his photo of Richard Maher. (*Id.* at 12:24–13:2). LaFollette testified that it took him a little bit of time to determine whether the passenger was Richard Maher.[1] (*Id.* at 28:13:19).

Either before LaFollette approached or while LaFollette was determining whether the passenger was Richard Maher, Wittwer performed a pat-down search of the passenger for safety reasons.[2] (*Id.* at 29:1–30:15; 74:5–24). As he was patting down the passenger, Officer Wittwer felt a round, long object in the left breast pocket of the passenger's denim jacket. (*Id.* at 76:1–8). Wittwer testified that he believed that the object was a knife, so he pulled the item out of the passenger's pocket. The item turned out to be a plastic toothbrush case. (*Id.* at 76:11–16). Wittwer then placed the toothbrush case on top of the car. Wittwer also felt a smaller, tapered, cylindrical object which he thought could be a knife; it was actually a pencil butane torch.[3] (*Id.* at 77:5–14; 78:3–5). When he pulled the torch out of the passenger's pocket, he also removed a syringe

1. According to a booking photograph of Richard Maher taken on August 18, 1998, he is six feet tall, weighs 210 pounds, has brown eyes and brown hair. (Ex. 106). According to Gary Borland's booking photograph taken on February 6, 1997, he is five feet eleven inches tall, weighs 160 pounds, has hazel eyes and brown hair. (Ex. 105). Although Mr. Borland has a receding hair line, Mr. Maher is much heavier than Mr. Borland, and Mr. Borland has a beard, the two actually look remarkably similar. I note that because Mr. Maher's picture was not taken until August of 1998, it is not known how much Mr. Maher weighed in February of 1997.

2. Officer Niemeyer testified that he did not perform a pat-down search of the driver be-

cause it was the passenger who was believed to be the fugitive. Instead, he just "covered" the driver while Wittwer and LaFollette handled the passenger. While he was "covering" the driver, the driver, later determined to be defendant Gregory Neemann, told him that the passenger began throwing things all over the vehicle after he noticed that they were being followed. Defendant's statement was not prompted by any questioning by Officer Niemeyer.

3. Officer Niemeyer testified that he thought that Wittwer discovered the butane torch during the search of defendant's automobile. However, he also testified that he was not sure what items Wittwer seized from the passenger's person.

and a small bag containing marijuana. (*Id.* at 77:21–78:2). Wittwer, who spent ten years in the narcotics unit, testified that he had seen similar butane torches used for heating rocks of crack cocaine. (*Id.* at 79:22–81:9). He also testified that he knew of no other use for the butane torch. (*Id.* at 105:13–16). He then continued to search the passenger and discovered other narcotics. (*Id.* at 81:12–82:1). Wittwer then arrested Borland.

At some point after the search of the passenger, LaFollette determined that the passenger was not Richard Maher. (*Id.* at 28:20–30:15; 82:14–83:10). LaFollette then conveyed this information to Officer Wittwer. (*Id.* at 24:13–19). LaFollette then entered the passenger side of the vehicle to talk to the defendant, Gregory A. Neemann. (*Id.* at 13:8–15). LaFollette asked defendant if Richard Maher was staying in a house on North 70th Street, and defendant replied that he was. (*Id.* at 14:2–7). Because LaFollette had no interest in either Borland or the defendant at that time, he left the scene. (*Id.* at 14:10–15:6).

After Wittwer arrested Borland and placed him in a cruiser, he approached the driver side of the vehicle where Niemeyer was talking with defendant. Wittwer told Niemeyer to place defendant in Niemeyer's cruiser until he finished a search of the vehicle. (*Id.* at 85:24–86:3). Wittwer testified that defendant was not under arrest at this time. (*Id.* at 86:4–5). Niemeyer and Wittwer proceeded to search defendant's vehicle, and discovered a fanny pack containing an appointment book with defendant's name on it and several bags of methamphetamine. (*Id.* at 86:18–87:10). Wittwer then placed defendant under arrest and read him his *Miranda* rights in the back of Niemeyer's cruiser. (*Id.* at 87:20–88:3). Wittwer testified that defendant stated that he understood his rights and that he was willing to speak with him. (*Id.* at 89:22–90:3). Wittwer did not threaten, coerce, or promise defendant anything to induce him to waive his rights. (*Id.* at 90:4–15). According to Wittwer, defendant understood the questions and

responded appropriately to them. (*Id.* at 90:20–91:11). Wittwer further testified that he did not believe that defendant was under the influence of drugs at the time. (*Id.* at 91:12–18).

Borland and defendant were then transported to the jail. Niemeyer testified that while on the way to the jail, he had a conversation with the defendant. Niemeyer testified that defendant never asked for an attorney during the questioning, nor requested that the questioning stop. Niemeyer also testified that he did not threaten, coerce, or promise defendant anything to induce him to answer his questions. He further testified that defendant did not appear to be under the influence of drugs. Finally, he testified that defendant appeared to understand the questions asked and that his responses tracked the questions.

Wittwer testified that when he arrived at the jail, he told Sergeant Miller and Investigator James A. Sydik of the Lincoln Police Department that he had read defendant his *Miranda* rights and that defendant had agreed to waive them. (*Id.* at 92:10–18). Investigator Sydik testified that he and Sergeant Miller spoke with defendant in an interview room at the Lancaster County Jail. (*Id.* at 107:10–24). Although Wittwer had told Miller and Sydik that defendant had waived his rights, Sydik testified that Miller asked defendant whether he understood that he had a right to remain silent. Defendant stated that he did. He also acknowledged that he had previously waived his rights. Sydik further testified that defendant indicated a willingness to talk to him and Miller. (*Id.* at 108:11–110:7). Defendant was not restrained during this conversation. (*Id.* at 110:25–111:2). Sydik did testify, however, that defendant seemed "rather hyper" and "his movements were a little bit jerky." (*Id.* at 111:10 & 111:12). In Sydik's opinion, this behavior was consistent with a person who was coming down off drugs. Also, defendant had told Sydik that he had been using drugs. (*Id.* at 112:5–15). Al-

though defendant had apparently been using drugs, Sydik testified that defendant seemed to understand the questions asked and that defendant's responses tracked with the questions. (*Id.* at 111:19–25). Sydik also testified that defendant had no difficulty following the questions and in fact provided "[s]everal different versions of detailed information." (*Id.* at 112:19:20). Sydik further testified that at no time did he or Sergeant Miller coerce, threaten, or promise defendant anything to induce him to talk to them. (*Id.* at 113:12–25).

### February 26, 1997

In the early morning hours of February 26, 1997, Officer Jeffrey Scott Alexander of the Lincoln Police Department received a call regarding an individual slumped over the steering wheel of a car on 24th Street between "E" Street and the Randolph Bypass.[4] (*Id.* at 33:24–34:2). After Alexander arrived at the scene, he exited his vehicle, approached the parked car, and observed an individual, later determined to be the defendant, Gregory Neemann, asleep or unconscious at the wheel. Alexander also noticed that the right front tire was up against the curb and that the rear end of the car was protruding out into the roadway.[5] (*Id.* at 34:6–17). Alexander then tapped on the window and talked to defendant to see if he was okay. (*Id.* at 34:25–35:16). Defendant awoke, and Alexander asked for identification. Defendant complied. (*Id.* at 35:11–20). Alexander testified that defendant's car was running when he approached it, and that after defendant rolled down the window, he reached into the car to turn it off for his safety.[6] (*Id.* at 39:23–40:4). In addition, Officer Todd Hruza, who was also at the scene, testified that when Officer Alexander was making contact with defendant, he noticed Officer Alexander reach into the vehicle and turn off the headlights and maybe the engine too.[7] Officer Alexander testified that as he and defendant were talking, medical units arrived. Because defendant stated that he did not request any medical attention, Alexander waived off the medical units. (*Id.* at 36:1–6).

Officer Alexander then asked defendant to exit the vehicle so that he could determine if defendant was intoxicated. (*Id.* at 36:8–10). Upon exiting the vehicle, defendant was taken to the rear of defendant's vehicle and asked to perform a serious of field sobriety tests, which he passed. (*Id.* at 36:18–20; 51:1–5). Also, Officer Alexander testified that he did not smell the odor of alcohol on defendant's breath. (*Id.* at 50:10–12). Despite the fact that it did not appear that defendant was intoxicated, Officer Alexander did not immediately re-

---

4. At the suppression hearing defendant adduced testimony from Sharon Codr, who is an employee of the 911 Center in Lincoln, Nebraska. Ms. Codr testified that there is no record of a 911 call made in the early morning hours of February 26, 1997 because such records are kept for only one year, unless someone, such as a police officer, requests that the record be kept longer. It appears that defendant presented the testimony of Ms. Codr in an attempt to demonstrate that no 911 call was made on February 26, 1997, regarding an individual slumped over the wheel of a car on 24th Street between "E" Street and the Randolph Bypass. However, I find it highly improbable that medical units would have arrived at the scene if no 911 call had been made.

5. Being a residential street, "angle parking" is not permitted on 24th Street.

6. Officer Alexander had initially testified that when he arrived he noticed that the car was not running and that the headlights were not on. (*Id.* at 34:10–13). After refreshing his memory from reading his police report, however, he remembered that defendant's vehicle was running when he arrived at the scene. (*Id.* at 38:10–16).

7. Contrary to Officer Alexander's and Officer Hruza's testimony, Officer Martin testified that he believed that Alexander turned off defendant's car at the time Alexander noticed the bag of marijuana on the floorboard of the car. However, because his attention was focused on the defendant, he testified that he was not sure if Alexander turned off the car at that time. (*Id.* at 61:7–17). Because of Martin's uncertainty, I find that Officer Alexander reached into defendant's car and turned off the engine prior to removing defendant from the vehicle.

turn defendant's driver's license. (*Id.* at 51:6–8). Instead, he decided to look inside defendant's vehicle to see if he could determine why defendant's car was parked askew. (*Id.* at 37:16–19). According to Officer Alexander and Officer Martin, when Alexander returned to defendant's vehicle, he noticed a bag of marijuana on the driver side floorboard through the open driver side window. (*Id.* at 38:21–39:11; 61:18–24). Alexander testified that he then notified Officers Martin and Hruza as to what he had found. (*Id.* at 40:10–12). Contrary to Alexander's and Martin's testimony, Officer Todd Hruza testified that it was Officer Martin, not Alexander, who noticed the bag of marijuana on the floorboard of defendant's vehicle. According to Officer Hruza, Martin motioned for him to come up to the driver side of defendant's vehicle. Upon arriving, Martin pointed to a bag of marijuana on the floorboard. Hruza testified that he could see the bag just by looking through the open car window. Hruza testified that either he or Martin then notified Alexander. Because Officer Martin's testimony does not corroborate Officer Hruza's version of who discovered the marijuana, I choose to accept Martin's and Alexander's version.

It is uncontroverted that after the marijuana was found, defendant was arrested and his person was searched. Officer Martin testified that as a result of the search of defendant, he and Officer Hruza found a glass crack pipe with residue on it and a wooden marijuana pipe that also contained residue. (*Id.* at 64:7–23). Officers Martin and Alexander then executed a search of the passenger compartment of defendant's vehicle, as well as the trunk. (*Id.* at 63:3–9).

At the suppression hearing defendant also presented testimony from Gregory Heng, the tow truck operator who towed defendant's vehicle on February 26, 1997, and James F. Kelly, a former Deputy Sheriff for Douglas County, Nebraska and a former Nebraska State Trooper. Their testimony pertained to whether defendant's car was against, upon, or over the curb and whether defendant's vehicle was blocking a lane of traffic. Because I conclude that the officers had reasonable suspicion to believe defendant had been driving while intoxicated and that Officer Alexander discovered the bag of marijuana in plain view, I do not reach the issue of whether the officers had probable cause to arrest defendant for blocking a lane of traffic on 24th Street. Therefore, a recitation of Heng's and Kelly's testimony is not necessary.

## DISCUSSION

### A. February 6, 1997

#### 1. Investigatory Detention

■ Defendant first argues that his vehicle was unlawfully stopped by Lincoln police officers on February 6, 1997. To stop an individual or a vehicle for investigatory purposes, police must have a reasonable, articulable suspicion that a crime has been or is being committed. *United States v. Lloyd,* 36 F.3d 761, 763 (8th Cir.1994) (citing *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). That is, the police must possess "particularized objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Chhunn,* 11 F.3d 107, 110 (8th Cir.1993) (quoting *United States v. Martin,* 706 F.2d 263, 265 (8th Cir.1983)). In determining whether police had the requisite "reasonable suspicion," a court must look to the totality of the circumstances including the collective knowledge and experience of the officers. *Id.; United States v. Dixon,* 51 F.3d 1376, 1381 (8th Cir.1995).

When Charles LaFollette of the United States Marshal's Office requested that defendant's vehicle be stopped, he possessed the following objective facts. First, he knew that an individual named Richard Maher was wanted for violating the terms of his pretrial release. Second, he saw a man, whom he believed to be Mr. Maher, but later determined to be Gary Borland, leave a residence on North 70th Street,

where he believed Maher was staying, and enter the passenger side of a vehicle. Although LaFollette was not entirely sure that the passenger was Mr. Maher, considering that it was dark, the passenger had a hat on, and the fact that Mr. Maher and the passenger, Gary Borland, look remarkably similar, especially with Borland wearing a hat, I conclude that it was reasonable for LaFollette to believe that the passenger in the vehicle was Maher. LaFollette's belief provided the requisite "reasonable suspicion" to stop the vehicle to determine whether the passenger was Mr. Maher. *See United States v. Hensley*, 469 U.S. 221, 226, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (stating that "law enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its *occupants* are involved in criminal activity." (citation omitted) (emphasis added)); *United States v. Owens*, 101 F.3d 559, 561 (8th Cir.1996) ("A police officer may stop an automobile if he has 'reasonable suspicion' that the occupant of the automobile is subject to seizure for violation of the law.") (citing *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)); *see also United States v. Lang*, 81 F.3d 955, 965–66 (10th Cir.1996) (stating that agent's mistaken belief that the defendant was an armed robbery and murder suspect was not unreasonable where agent was not privy to additional information regarding suspect's identity, agent had only 10 seconds to observe person he believed was suspect before that person entered car, and agent's later observation of that person in moving car made identification difficult). As such, Officers Wittwer and Niemeyer executed a valid *Terry* stop when they stopped defendant's vehicle in reliance on LaFollette's request. *See United States v. Rich*, 795 F.2d 680, 682 (8th Cir.1986) ("[T]he court does not merely look to the actual knowledge of the arresting officer, but to the combined knowledge of all the officers involved." (citation omitted)).

### 2. Search of Defendant's Vehicle

■ Defendant next argues that even if the police executed a valid *Terry* stop, the search of the interior of his car was unlawful. Defendant's argument is premised on the notion that the pat-down search of the passenger was unlawful, and therefore the arrest of the passenger was unlawful, and therefore the search of his car incident to the passenger's arrest was likewise unlawful. The problem with defendant's argument lies with its fundamental assumption that he may challenge the search of the passenger.

■ The United States Supreme Court has explained that "'Fourth Amendment rights are personal [and] may not be vicariously asserted.'" *Rakas v. Illinois*, 439 U.S. 128, 134, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *see United States v. Salvucci*, 448 U.S. 83, 85, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) (stating that defendants may claim the benefits of the exclusionary rule only if their own Fourth Amendment rights have been violated). In *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), the Supreme Court stated that "in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; i.e., one which has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Id.* at 472 (quoting *Rakas*, 439 U.S. at 143–44 & n. 12, 99 S.Ct. 421). Thus, although there was a substantial amount of testimony adduced at the hearing regarding the pat-down search of the passenger, the issue of whether the passenger's Fourth Amendment rights were violated is irrelevant to whether the search of defendant's vehicle was lawful unless defendant has an expectation of privacy with respect to the search of the passenger. Contrary to defendant's argument, the Eighth Circuit "has held that an individual [has] no standing under the Fourth Amendment to con-

test the search and seizure of drugs from another person." *United States v. Gutberlet,* 939 F.2d 643, 646 (8th Cir.1991) (citations omitted). This is so even though the search of the passenger led to the search of defendant's vehicle. *See, e.g., United States v. Rodrequez,* 859 F.2d 1321, 1325 (8th Cir.1988) (concluding that the defendant did not have standing to complain of the search of a codefendant, even though that search led to the defendant's arrest); *United States v. Meadows,* 885 F.Supp. 1, 3–4 (D.D.C.1995) (concluding that the discovery of a motel room key pursuant to a search incident to a codefendant's unlawful arrest, which led to the discovery of drugs and weapons in the room, could not be challenged by the remaining defendants); *see also Mayes v. United States,* 653 A.2d 856 (D.C.1995) (concluding that although police officers violated the defendant's companion's Fourth Amendment rights when they unlawfully searched him and discovered a weapon, defendant could not challenge the unlawfulness of that discovery in attempt to demonstrate that his arrest was likewise unlawful); *State v. Becker,* 458 N.W.2d 604 (Iowa 1990) (concluding that where the stop of the vehicle was lawful, the driver lacked standing to object to the illegal out-of-vehicle detention of the passenger which provided facts leading to the frisk of the driver). Because defendant does not have a reasonable expectation of privacy in the pat-down search of the passenger, he may not challenge that search.

■ The only issue then is whether the police properly searched defendant's car incident to a lawful arrest. Here, after Officer Wittwer discovered the marijuana in the passenger's pocket, he had probable cause to arrest the passenger and conduct a search of defendant's car incident to that arrest. *See New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) (stating that "when a [police officer]

has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile" (footnotes omitted)). When the ensuing search uncovered a fanny pack containing an address book with defendant's name on it and several bags of methamphetamine, probable cause existed to arrest defendant for possession of narcotics. *See Travis,* 993 F.2d at 1323 (stating that probable cause to make a warrantless arrest "exists when officers possess information that would 'warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" (quoting *Beck,* 379 U.S. at 91, 85 S.Ct. at 224)). The search of defendant's vehicle and defendant's arrest were, therefore, lawful. Accordingly, the evidence seized from defendant's vehicle is admissible.

### 3. Defendant's Statements to Police

■ Defendant's motion to suppress, (filing 54), does not challenge the voluntariness of his statements to police; instead, it argues only that because the stop and the subsequent search of his vehicle were unlawful, his statements to police must be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Because I have concluded that the stop of defendant's automobile and the subsequent search of that vehicle were constitutionally permissible, defendant's statements could not have been the product of an unlawful detention, search, or arrest. I therefore conclude that defendant's statements to police are admissible.[8]

### B. February 26, 1997

#### 1. Investigatory Detention & Arrest

■ Defendant first argues that he was detained in violation of the Fourth

---

8. Defendant's statement to Officer Niemeyer about the passenger throwing items all over the car is also admissible because it was volunteered by defendant before his arrest and it was not made in response to interrogation by

Officer Niemeyer. *United States v. Turner,* 157 F.3d 552, 556 (8th Cir.1998) (citing *Rhode Island v. Innis,* 446 U.S. 291, 299, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)).

Amendment, and therefore any evidence seized as a result of that detention must be suppressed as fruit of the poisonous tree. Based on the evidence adduced at the suppression hearing, I conclude that police officers executed a valid *Terry* stop of defendant on February 26, 1997. When Officer Alexander asked defendant to exit his vehicle and then detained him to perform field sobriety tests, he possessed the following objective facts. First, he had been dispatched in the early morning hours to respond to a medical call on 24th Street between "E" Street and the Randolph Bypass, regarding an individual slumped over the steering wheel of a car. Second, when he arrived at the scene, he noticed that the right front tire of the vehicle was tightly against the curb, that the left rear end of the car was protruding excessively out into the street, where only parallel parking is permitted, and that the engine of the vehicle was still running. Third, after approaching the vehicle, he observed an individual, later determined to be the defendant, Gregory Neemann, asleep or unconscious at the wheel. Fourth, he observed defendant's eyes to be watery and bloodshot. These facts and circumstances provided the requisite "reasonable suspicion" to detain defendant to determine if he had been driving while intoxicated. That is, when Officer Alexander detained defendant, he possessed information that would have led a prudent person to suspect that defendant had been operating a motor vehicle while intoxicated.[9] *See Lloyd,* 36 F.3d at 763 ("In order to conduct an investigatory stop, police must have a reasonable articulable suspicion that a crime has been or is being committed and need not possess the prob-

able cause necessary to make a full arrest." (citations omitted)).

Defendant next argues that even if the initial stop was lawful, the officers exceeded the scope of a *Terry* stop when they failed to return his license after he passed the field sobriety tests.[10] The relevant inquiry is whether the officer's action "was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20, 88 S.Ct. 1868. The Supreme Court has instructed that an investigative detention must "last no longer than is necessary to effectuate the purpose of the stop," and "[t]he scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Although defendant passed the field sobriety tests, considering that the front right tire of defendant's automobile was up against the curb and that defendant had bloodshot and swollen eyes, it was perfectly reasonable for Officer Alexander to detain defendant so that he could look inside of the vehicle to see if there was anything inside of the car which could explain defendant's condition. This took a matter of moments. Defendant was not detained for an inordinate amount of time. Under the circumstances, I find that Officer Alexander's actions were "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20, 88 S.Ct. 1868.

Defendant next argues that even if the officers did not exceed the scope of a *Terry* stop, the officers did not lawfully seize the marijuana pursuant to

9. Under Nebraska Revised Statute § 60–6,196 it is "unlawful for any person to operate or be in actual physical control of any motor vehicle" while under the influence of alcohol or any drug. NEB. REV. STAT. ANN. § 60–6,196 (Michie 1995). The fact that defendant was not operating the vehicle is of no consequence because the Nebraska Supreme Court has stated that "[c]ircumstantial evidence may also serve to establish the operation or physical control of a motor vehicle, under the

provisions of [§ 60–6,196]." *State v. Baker,* 224 Neb. 130, 133, 395 N.W.2d 766 (1986).

10. At the suppression hearing defendant also argued that Officer Alexander committed an illegal search when he reached into defendant's vehicle to shut off the ignition. Even assuming that this was an illegal search, Officer Alexander did not discover any evidence as a result of this "search"; thus, the exclusionary rule would not apply in this instance.

the plain-view doctrine. The plain-view doctrine allows a police officer to seize evidence without a warrant when

> (1) "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed," (2) the object's incriminating character is immediately apparent, and (3) the officer has "a lawful right of access to the object itself." *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990); *see also United States v. Wayne*, 903 F.2d 1188, 1195–96 (8th Cir.1990) (pre-*Horton* case). The discovery of evidence in plain view need not be inadvertent. *Horton*, 110 S.Ct. at 2304, 2308 (eliminating inadvertence requirement of plurality in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)).

*United States v. Hughes*, 940 F.2d 1125, 1126–27 (8th Cir.1991).

■ Here, I have previously concluded that the officers were justified in detaining defendant pursuant to *Terry, supra.* Thus, Officer Alexander had a right to be where he was when he looked through defendant's open car window. Also, "looking through the defendant's car window did not violate the Fourth Amendment." *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir.1995). Nor did Officer Alexander's use of a flashlight to look inside the vehicle violate the Fourth Amendment. *United States v. Garner*, 907 F.2d 60, 62 n. 2 (8th Cir.1990). The first element of the plain-view doctrine is satisfied.

■ The next issue is whether the incriminating nature of what Officer Alexander saw was immediately apparent. The immediately apparent standard means that police officers must have " 'probable cause to associate the property with criminal activity.' " *Id.* at 62 (quoting *Texas v. Brown*, 460 U.S. 730, 741–42, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983)) (emphasis deleted) (quoting *Payton v. New York*,

445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980)). "Probable cause demands not that an officer be 'sure' or 'certain' but only that the facts available to a reasonably cautious man would warrant a belief 'that certain items may be contraband or stolen property or useful as evidence of a crime.' " *Id.* (*Brown*, 460 U.S. at 742, 103 S.Ct. at 1543). Officer Alexander testified that when he looked through the open driver side window, he noticed and immediately recognized a bag of marijuana on the floorboard. (Transcript of Sept. 18, 1998 Suppression Hearing, Filing 62, at 39:4–11). Because marijuana by its nature is incriminating, the second element is satisfied. *See Garner*, 907 F.2d at 62 (stating that the incriminating nature of marijuana plants was immediately apparent to the officer "who was trained in the recognition of marijuana and personally had seized marijuana plants in previous police encounters").

■ Turning to the third element, once Officer Alexander observed the marijuana, he was justified in entering defendant's vehicle to seize the marijuana under the automobile exception. *See United States v. Bloomfield*, 40 F.3d 910, 919 (8th Cir. 1994) (en banc) ("Once probable cause is established, a car can be searched without a warrant under the automobile exception to the warrant requirement." (citation omitted)). Because all the plain-view doctrine elements were satisfied in this case, the warrantless seizure of the marijuana from defendant's vehicle was justified. The subsequent arrest of defendant was also lawful.[11] *See Travis*, 993 F.2d at 1323 (stating that probable cause to make a warrantless arrest "exists when officers possess information that would 'warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' " (quoting *Beck*, 379 U.S. at 91, 85 S.Ct. at 224)).

---

**11.** Even if, as Officer Hruza testified, Officer Martin discovered the bag of marijuana on the driver side floorboard, instead of Alexander, its seizure would still be lawful pursuant to the plain-view doctrine.

### 2. Search of Defendant's Person & Vehicle

 Because the warrantless arrest of defendant was justifiable, the subsequent search of his person incident to that arrest was permissible. *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) ("[I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."). Based on the foregoing, I conclude that the search of defendant's person was valid and I shall recommend that defendant's motion to suppress be denied with respect to any evidence seized during that search.

With respect to the search of defendant's automobile, "automobiles ... may be searched without a warrant in circumstances that would not justify the search without a warrant of a house or an office, provided that there is probable cause to believe that the car contains articles that the officers are entitled to seize." *Chambers v. Maroney*, 399 U.S. 42, 48, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (citing *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)). *See also United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *United States v. Hogan*, 25 F.3d 690, 693 (8th Cir.1994) (explaining that police may conduct a warrantless search of every part of a legitimately stopped vehicle, including the trunk and all its containers, if there is probable cause to believe it contains evidence of a crime). The facts and circumstances recited above in the discussion of defendant's arrest and search of defendant's person also provided ample probable cause for the search of defendant's vehicle and any containers found in it.[12] That is, the officers involved possessed information that would have led a prudent person to believe that other drugs were in the vehicle. Based on the foregoing, I conclude that the search of defendant's vehicle and its contents was valid. Accordingly, I shall recommend that defendant's motion to suppress be denied with respect to any evidence seized in that search.

### CONCLUSION

Based on the foregoing discussion, I shall recommend that defendant's motion to suppress, (filing 54), be denied in its entirety.

February 22, 1999.

---

**12.** The search of the passenger compartment of defendant's vehicle is also justified as a search incident to arrest. *See Belton*, 453 U.S. at 460, 101 S.Ct. 2860; *United States v. Maza*, 93 F.3d 1390, 1396–97 (8th Cir.1996).