**UNITED STATES of America, Appellee,**

v.

**Carl Edward DICKSON, Appellant.**

**No. 94–3784.**

United States Court of Appeals,
Eighth Circuit.

Submitted May 16, 1995.

Decided June 29, 1995.

Virginia G. Villa, Federal Public Defender, argued, Minneapolis, MN, for appellant.

Andrew Stephen Dunne, argued, Minneapolis, MN, for appellee.

Before WOLLMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and BOGUE,* Senior District Judge.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

One evening in late 1993, the police in St. Paul, Minnesota, received a report of a green Cadillac, with black males in it, "prowling" in a shopping center that was near a bank. The following day, a black man robbed the bank using a gun. The robber escaped in a white-and-yellow Oldsmobile driven by another person. Shortly after the robbery, the police received a report of two "suspicious" black males in jeans getting out of a white-and-yellow Oldsmobile a short distance from the bank.

A police dog tracking the scent from the Oldsmobile led the police to an apartment complex with nine apartment buildings that share one parking lot. At least three people from the apartment complex stated that a white-and-yellow Oldsmobile had been seen in the area of the parking lot outside one particular apartment building. The caretaker for the apartment complex then told the police that two apartments in that building were "problem" apartments.

Meanwhile, outside that apartment building, other police stopped a green Cadillac with Carl Edward Dickson, two male juveniles who "looked ... [like] adults" to one officer, and a woman (all of whom are black persons) in it. After receiving "evasive" answers to questions regarding lack of personal identification and ownership documents for the car and after finding "a substantial amount of money" in Mr. Dickson's pocket, the police detained the three males in a squad car until witnesses from the bank could arrive.

Within approximately 15 minutes (about an hour after the robbery), four witnesses from the bank arrived and identified Mr. Dickson as the robber. The police then arrested Mr. Dickson and the two juveniles. In the squad car after the arrest, one of the officers encouraged Mr. Dickson to "cooperate with [the] investigators when they talk[ed] to him." Mr. Dickson then asked the officer "how much time he was going to be getting for this."

After Mr. Dickson and the male juveniles were arrested, the police searched the Cadillac. In the back, between the seat and the backrest, they found a set of keys. The police then went to both of the apartments identified by the caretaker as "problem" apartments. In the first apartment, they received consent to search the apartment; they found nothing, and none of the keys opened the apartment door. One officer then went to the second apartment and tried the keys in that apartment door. One of the keys unlocked the door. (The officer knocked and received no answer; it is not clear whether that was before or after he tried the keys in the door.) Identifying himself as a police officer, he entered the apartment. While checking to see if anyone was in the apartment, he saw an envelope addressed to the woman who had been in the Cadillac. The woman then gave oral permission for the police to search the apartment but refused to sign a consent form. The police subsequently obtained a search warrant for the apartment and found a gun and $20,000 in cash.

The police took Mr. Dickson to police headquarters. After advising Mr. Dickson of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), FBI agents asked if he was willing to talk with them. Mr. Dickson responded, "[M]aybe I should have a lawyer." The FBI agents began "[g]etting up," and one of them told Mr. Dickson to "give them a call" if he changed his mind about talking with them. Mr. Dickson then said, "[O]kay, I changed my mind, I want to talk to you." The FBI

---

* The HONORABLE ANDREW W. BOGUE, Senior United States District Judge for the District of South Dakota, sitting by designation.

agents again advised him of his rights under *Miranda,* and he gave a statement to them.

In mid–1994, Mr. Dickson pleaded guilty in federal district court to one count of bank robbery involving the use of a dangerous weapon. *See* 18 U.S.C. § 2113(a), § 2113(d). Mr. Dickson's plea was conditional upon appellate review of the district court's denial of his motion to suppress the evidence recovered from the Cadillac and the apartment and the statements that he made in the squad car and at police headquarters. *See* Fed.R.Crim.P. 11(a)(2). With respect to a motion to suppress, we "review the district court's findings of fact for clear error and review the ultimate conclusion of whether the [police actions] violated the Fourth Amendment de novo." *United States v. Dawdy,* 46 F.3d 1427, 1429 (8th Cir.1995). (Our recitation of facts in all parts of this opinion is derived from a magistrate's findings of fact in a report on the hearing, which the magistrate conducted, on Mr. Dickson's motion to suppress; the district court adopted all of the magistrate's factual findings. Our examination of the record reveals that none of those findings is clearly erroneous.) We affirm the ruling of the district court.[1]

### I.

Mr. Dickson first argues that the stop of the green Cadillac was not based on "specific and articulable facts ... taken together with rational inferences," *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968), but was prompted only by an "inarticulate hunch[ ]," *id.* at 22, 88 S.Ct. at 1880–81, and was therefore unreasonable under the fourth amendment. *See, e.g., id.* at 19–20, 88 S.Ct. at 1879. Our inquiry in this respect is "a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference [with the liberty of a citizen] in the first place.... [W]e deal here with an entire rubric of police conduct—necessarily swift action predicated

upon the on-the-spot observations of the officer on the beat." *Id.*

Courts have used different collections of words "to capture the elusive concept of what cause is sufficient to authorize police to stop a person.... But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981). In reconstructing that picture, we first consider the information available to the police at the time. *See, e.g., id.* at 418, 101 S.Ct. at 695. Objective observations and police reports allow a trained officer to draw inferences and to make deductions "that might well elude an untrained person. The process does not deal with hard certainties, but with probabilities." *Id.* We weigh that information "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* Evaluation of that evidence must then raise a suspicion that the particular person who was stopped had been engaged in wrongdoing. *See, e.g., id.*

The officer who stopped the Cadillac had 16 years of experience. He knew about the bank robbery, knew that witnesses had described the robber as a black man, knew of the report of two "suspicious" black males in jeans leaving the apparent getaway car, and knew that the apparent getaway car had been seen at the apartment complex toward which the police dog was leading him in tracking the scent from the apparent getaway car. As the officer approached that apartment complex, he saw a green Cadillac with two black males and a woman in it. A third black male, in jeans, got into the car, and the car started to pull away from the curb. At that point, the officer remembered the previous night's report of black males in a green Cadillac "prowling" in the shopping center near the bank. That coincidence led him to decide to make an investigative stop of the Cadillac.

---

1. The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota.

We agree with Mr. Dickson that the evidence supporting the stop of the Cadillac is not extensive. We believe, however, that the combination of circumstances—the close temporal proximity of the bank robbery to the previous night's report of a green Cadillac "prowling" in the same neighborhood as the bank, the close geographical proximity of the green Cadillac to the apparent getaway car from the bank robbery, a connection between the apparent getaway car and the apartment complex where the green Cadillac was sighted, and the similarity (though extremely broad) between the descriptions of the robber, the two "suspicious" persons leaving the apparent getaway car, and the persons "prowling" in the area on the previous night—is sufficient to sustain the officer's decision to stop the Cadillac. We therefore reject Mr. Dickson's argument that evidence recovered as a result of the stop was tainted and thus inadmissible.

### II.

Mr. Dickson also argues that his detention by the police pending the arrival of the witnesses from the bank exceeded the proper scope of a detention consequent to an investigative stop under *Terry v. Ohio*, 392 U.S. 1, 19–20, 29, 88 S.Ct. 1868, 1883–84, 20 L.Ed.2d 889 (1968), and became a *de facto* arrest, which would have required probable cause rather than reasonable suspicion. *See, e.g., United States v. Dixon*, 51 F.3d 1376, 1380 (8th Cir.1995), and *United States v. Raino*, 980 F.2d 1148, 1149 (8th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1662, 123 L.Ed.2d 280 (1993).

■■■ Any detention consequent to an investigative stop must be temporary and must last no longer than necessary. *See, e.g., Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983) (plurality opinion). The police must then use investigative methods that amount to the least intrusive means "reasonably available to verify or dispel ... suspicion" within a short time. *Id.; see also United States v. Dixon*, 51 F.3d at 1380 n. 3. Generally, the police may take reasonably necessary steps to

"maintain the status quo of a situation while verifying or dispelling suspicion." *United States v. Seelye*, 815 F.2d 48, 50 (8th Cir. 1987). "[O]bvious exigencies" allow the police to continue an investigative stop to stabilize a situation until they can determine whether full custodial arrest is warranted. *United States v. Lego*, 855 F.2d 542, 545 (8th Cir.1988).

■■■ In deciding whether a detention lasts too long to be justified in an investigative stop, and therefore becomes an arrest, we consider whether the police "diligently pursued" a means of investigation likely to resolve their suspicions quickly. *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575–76, 84 L.Ed.2d 605 (1985). There is no " 'bright line' rule"; instead, we rely on common sense and ordinary human experience. *Id.* at 685, 105 S.Ct. at 1574–75. We also take into account the pressures of rapidly developing events; in such cases, we try to avoid "unrealistic second-guessing." *Id.* at 686, 105 S.Ct. at 1575. Our inquiry is not merely whether other alternatives were available, but whether the police unreasonably failed to recognize or to pursue such other alternatives. *See, e.g., id.* at 687, 105 S.Ct. at 1576.

■■■ Once the green Cadillac was stopped, the police asked the three males in it for personal identification and ownership documents for the car. Neither the driver (one of the male juveniles) nor the other males in the car had personal identification. The driver had no documents for the car. Since a "pat search[ ]" had revealed "a substantial amount of money" in Mr. Dickson's pocket, and it had been confirmed (from the license plate number) that the car was the same green Cadillac seen "prowling" the previous night in the shopping center near the bank, the police detained the three males in a squad car until witnesses from the bank could arrive. Those witnesses arrived within approximately 15 minutes and identified Mr. Dickson as the robber.

We believe that the police acted reasonably and appropriately in detaining Mr. Dickson

in a squad car until the witnesses from the bank arrived. That action "maintain[ed] the status quo," *United States v. Seelye*, 815 F.2d at 50, and "stabilized the situation," *United States v. Lego*, 855 F.2d at 545, pending the quickest means of investigation, *see, e.g., United States v. Sharpe*, 470 U.S. at 686, 105 S.Ct. at 1575–76, reasonably available to confirm the officers' suspicions, *see, e.g., Florida v. Royer*, 460 U.S. at 500, 103 S.Ct. at 1325–26 (plurality opinion), namely, to bring witnesses from the bank for possible identification of the robber. The witnesses arrived within 15 minutes—a period, in our view, well within acceptable limits in the circumstances of this case. *See, e.g., United States v. Dixon*, 51 F.3d at 1381, and *United States v. White*, 42 F.3d 457, 460 (8th Cir.1994). We see no evidence that the police were "dilatory in their investigation" or that there was any unnecessary delay. *United States v. Sharpe*, 470 U.S. at 687, 105 S.Ct. at 1576. We therefore reject Mr. Dickson's contention that his detention was so unreasonably long as to become an arrest requiring probable cause.

### III.

Mr. Dickson challenges the initial and second entries into the apartment by the police. He argues that trying the key (among those found in the Cadillac) in the apartment door amounted to a warrantless search. He then argues that the entry of the police into the apartment after unlocking the door was unlawful, since it fell outside the scope of a protective sweep. Finally, he argues that the second entry into the apartment, pursuant to the warrant, was also unlawful, since the affidavit for the warrant included information obtained during the initial entry into the apartment.

We need not delve, fortunately, into the intricacies of whether trying a key in a lock is a search, *see, e.g., United States v. Concepcion*, 942 F.2d 1170, 1172 (7th Cir.1991); *United States v. Lyons*, 898 F.2d 210, 212–13 (1st Cir.1990), *cert. denied*, 498 U.S. 920, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990); *United States v. Grandstaff*, 813 F.2d 1353, 1358 n. 5

(9th Cir.1987) *(per curiam)*, *cert. denied*, 484 U.S. 837, 108 S.Ct. 119, 98 L.Ed.2d 78 (1987); and *United States v. DeBardeleben*, 740 F.2d 440, 443–44 n. 1 (6th Cir.1984), *cert. denied*, 469 U.S. 1028, 105 S.Ct. 448, 83 L.Ed.2d 373 (1984), or of whether, even if such an act is a search, the minimal intrusion is justifiable even without probable cause, *see, e.g., Artes–Roy v. Aspen, City of*, 31 F.3d 958, 962–63 (10th Cir.1994); *United States v. Concepcion*, 942 F.2d at 1172–73; *United States v. Lyons*, 898 F.2d at 212–13, 213 n. 2; *United States v. Grandstaff*, 813 F.2d at 1358; and *United States v. DeBardeleben*, 740 F.2d at 445. That is because Mr. Dickson has failed to prove that he "had a legitimate expectation of privacy in the particular area[s] searched." *United States v. Delaney*, 52 F.3d 182, 188 (8th Cir.1995).

In this case, Mr. Dickson had the burden of proving that he had a legitimate expectation of privacy that was violated by a search. *See, e.g., United States v. Hoey*, 983 F.2d 890, 892 (8th Cir.1993). To do so, he first had to show that he had "a reasonable expectation of privacy" in the areas searched. *Id.* He then had to show that "society is prepared to accept" his expectation of privacy as "objectively reasonable." *Id.*

"To meet the first part of the test, [the defendant] must demonstrate that by his conduct, he sought to preserve [the area of the search] as private." *United States v. Stallings*, 28 F.3d 58, 60 (8th Cir.1994). Whether we consider the keys themselves, the apartment lock, or the apartment, Mr. Dickson points to "no evidence of his possession or control ..., his historical use ..., or his ability or attempts to regulate access," *id.* at 60–61, to those items. *See also United States v. Monie*, 907 F.2d 793, 794–95 (8th Cir.1990); *United States v. Macklin*, 902 F.2d 1320, 1330 (8th Cir.1990), *cert. denied*, 498 U.S. 1031, 111 S.Ct. 689, 112 L.Ed.2d 680 (1991); and *United States v. Grandstaff*, 813 F.2d at 1357. Nor, in fact, does he offer any proof of "a subjective anticipation of privacy" in those items or of "the objective reasonableness" of that expectation. *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir.1994).

Regardless, therefore, of whether we characterize those questions as ones of standing or of the merits of a fourth amendment inquiry, *see, e.g., United States v. Macklin,* 902 F.2d at 1331 n. 12, we reject Mr. Dickson's challenge to the entries into the apartment by the police.

## IV.

Mr. Dickson also challenges the admissibility of the statements that he made in the squad car and subsequently to FBI agents at police headquarters. He argues that he made the first statement before he received the appropriate warnings under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the second statement under renewed questioning after he had already invoked his right to counsel.

■■■ Our task with respect to the first statement is complicated slightly by the fact that neither the magistrate (who conducted the hearing on Mr. Dickson's motion to suppress and then made findings of fact) nor the district court (which adopted the magistrate's factual findings) made any explicit findings about whether Mr. Dickson received *Miranda* warnings prior to the statement that he made in the squad car about "how much time he was going to be getting" for the bank robbery. We believe, however, that because Mr. Dickson raised the *Miranda* issue in his motion to suppress, yet the district court denied the motion, a ruling that the *Miranda* warnings were given is implicit in the district court's action. Such a ruling is amply supported by uncontradicted testimony from the hearing on the motion to suppress that when one police officer tried to read the *Miranda* warnings to Mr. Dickson immediately after the statement in the squad car, Mr. Dickson said that another officer at the scene had already advised him of his rights. That acknowledgment by Mr. Dickson was certainly admissible as an admission of a party-opponent. *See* Fed.R.Evid. 801(d)(2)(A). In light of that testimony and the district court's subsequent denial of Mr. Dickson's motion to suppress the statement that he made in the squad car, the district court's implicit finding

that Mr. Dickson had been advised of his *Miranda* rights when he made that statement is not clearly erroneous.

Mr. Dickson contends, with respect to the statement that he gave to FBI agents at police headquarters, that he had already invoked his right to counsel, yet the FBI agents continued to question him, in effect prompting him to "reconsider his request for counsel" through "subtle persuasion." We assume that Mr. Dickson is intimating that he did not effectively waive his *Miranda* rights. We disagree.

■■ "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda,* 384 U.S. at 473–74, 86 S.Ct. at 1627–28. If questioning does not cease, and the defendant gives a statement outside the presence of a lawyer, the government bears the "heavy burden" of showing that the defendant "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.* at 475, 86 S.Ct. at 1628.

■■ Once Mr. Dickson was at police headquarters, two FBI agents identified themselves and asked him if he would be willing to talk. At that time, Mr. Dickson said, "[M]aybe I should have a lawyer." As the FBI agents were "[g]etting up," one of them stated that "at any point [Mr. Dickson] could change his mind" and that "if [Mr. Dickson] wanted to talk," he could "give them a call." Mr. Dickson then said, "[O]kay, I changed my mind, I want to talk to you."

We do not consider the FBI agent's suggestion that Mr. Dickson could "give them a call" if he changed his mind to have been "either express questioning or its functional equivalent"—*i.e.,* "any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). Mr. Dickson offers no evidence of his own perceptions at that time, *see, e.g., id.* at

301, 100 S.Ct. at 1689–90, and we do not view the remarks of the FBI agent as "particularly 'evocative,'" *id.* at 303, 100 S.Ct. at 1691. Nor do we see any evidence that the FBI agents "carried on a lengthy harangue" between themselves in Mr. Dickson's presence. *Id.* Indeed, we see nothing to indicate that the FBI agents were anything but "respectful of the rights of the defendant." *United States v. Thompson*, 866 F.2d 268, 271 (8th Cir.1989), *cert. denied,* 493 U.S. 828, 110 S.Ct. 94, 107 L.Ed.2d 59 (1989). We hold, therefore, that the comments of the FBI agent at that point were not "interrogation" under the law, *see, e.g., Rhode Island v. Innis,* 446 U.S. at 301, 100 S.Ct. at 1689, and that Mr. Dickson's decision to abandon his request for a lawyer was "an uncoerced choice," *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). We reject, accordingly, his challenge to the statement given to the FBI agents.

### V.

For the reasons stated, we affirm the ruling of the district court.