UNITED STATES of America,

v.

Joseph Dominic Marcel MALTAIS,
Defendant.

No. C4–03–058.

United States District Court, D. North Dakota, Northwestern Division.

Dec. 16, 2003.

Scott J. Schneider, U.S. Attorney's Office, Bismarck, ND, for U.S.

Chad Rory McCabe, Vinje Law Firm, Bismarck, ND, for defendant.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

HOVLAND, Chief Judge.

Before the Court is the Defendant's Motion to Suppress evidence seized by law enforcement officers on August 8, 2003. A hearing on the motion was held on Friday, December 5, 2003. For the reasons set forth below, the motion is denied.

## I. BACKGROUND OF THE CASE

At approximately 1:00 a.m. on August 8, 2003, Senior Patrol Agent Robert Danley was performing border patrol duties in a marked border patrol vehicle when he observed the defendant, Joseph Dominic Marcel Maltais ("Maltais"), sitting in the driver's seat of a Dodge truck with a Manitoba license plate DPH 305. The truck was towing a Fleetwood fifth wheel camper trailer with a Manitoba license plate J714H. The truck was parked facing south by the side of Bottineau County Road 6, approximately seven miles north and one-and-a-half miles west of the "Landa Intersection." This location is in an isolated, rural area approximately 500 yards or a quarter-mile south of the United States and Canadian Border.

Agent Robert B. Danley drove past the truck, turned around, stopped his vehicle, and requested license checks on the truck and the trailer. Agent Danley was on special assignment from Texas and had been working on the northern border of North Dakota since late July 2003. There had been suspicions of drug trafficking activity in the border area and Agent Danley had become familiar with such suspected activities since his arrival in North Dakota. Agent Danley was aware that a truck and trailer matching the vehicles at the side of the road had recently undergone an inspection at the Dunseith, North Dakota, Port of Entry on or about June

10, 2003. During that inspection, the Bureau of Customs and Border Protection Inspectors had found several hidden compartments in the floorboards of the trailer. Such hidden compartments are commonly used by those involved in drug trafficking. The compartments were empty at the time of the inspection. Agent Danley also knew that a local farmer reported that he saw a truck and trailer matching this description driving in the area in the early morning hours. Agent Danley was aware of several roads in this area that cross the United States and Canadian border where there are no designated ports of entry and that these roads can be easily driven by almost any vehicle. In addition, Agent Danley was aware that Canadian authorities also suspected that a drug smuggling operation was using this area to smuggle drugs into the United States.

After a few moments had passed, Maltais approached Agent Danley's vehicle and inquired whether anything was wrong. At this point, Agent Danley's and Maltais' versions of the events differ slightly. According to Agent Danley, he told Maltais that nothing was wrong but he inquired about Maltais' immigration status. Maltais told Agent Danley that he was a Canadian citizen and had last entered the United States about one month ago at an unknown port of entry on the United States and Canadian border. Agent Danley then asked Maltais why he was at this particular location. Maltais responded that he was traveling back to Canada, got lost, and decided to take a nap.

Agent Danley testified that he doubted the truthfulness of Maltais' statements because the route Maltais described did not exist. According to Agent Danley, Maltais said that he had attempted to cross the border at a Port of Entry north of Westhope but it was closed. Maltais then traveled south on Highway 83 and took a left turn onto a gravel road and headed east to get to the location where Agent Danley found him. Agent Danley did not believe Maltais' statement because he knew that the gravel road did not cross the Souris River and continue on to the location where he found Maltais.

Agent Danley also asked Maltais why his vehicle was facing south if he was traveling north to Canada. Maltais made a smart remark about backing into this location from a paved road. Agent Danley then informed Maltais that the nearest paved road was six miles away and then asked whether Maltais had backed up his truck and trailer for six miles to which Maltais responded, "yes." When Agent Danley asked Maltais additional questions about his reasons for being at this location, Maltais asked to speak to a lawyer. Agent Danley then told Maltais to return to his truck and stay there.

During this same period of time, Senior Patrol Agent Bernard G. Olson had been in radio contact with Agent Danley to inform him that the vehicle Maltais was driving was suspected of being involved in contraband smuggling. Agent Danley testified that he had been made aware of such suspicions prior to August 8, 2003. Agent Olson had been present at the Dunseith Port of Entry on June 10, 2003, when the truck and trailer were inspected. Agent Olsen requested that Agent Danley detain Maltais until he could get to the scene. Agent Danley approached Maltais, noticed he was talking on a cellular phone, and instructed him to exit the truck. Agent Danley then frisked Maltais and placed him in the back of his Border Patrol vehicle.

Maltais' version of his interaction with Agent Danley is somewhat different. *See* Affidavit of Maltais. Maltais states that when he asked Agent Danley whether there was a problem, Agent Danley said "no" and instructed Maltais to go wait in

his truck and to obtain identification. After a few moments, Agent Danley approached Maltais and asked to see his passport. Maltais explained that he did not have a passport, but that he did have a Canadian driver's license and a birth certificate. Agent Danley briefly reviewed these items and then handed them back to Maltais. Agent Danley then asked Maltais questions about when he last entered the United States. Maltais answered that he entered the United States ten days ago via a flight from Vancouver, British Columbia to San Francisco, California. Maltais also stated that he entered the United States with his vehicle on July 4th at a border crossing between British Columbia and the state of Washington. According to Maltais, Agent Danley said he did not believe Maltais was telling the truth. Maltais then asked Agent Danley if he was under arrest and Agent Danley responded that he was not. Maltais asked if he was free to go and Agent Danley responded that Maltais was not allowed to leave. Maltais then asked why he was not allowed to leave and if he could speak to a lawyer. Agent Danley responded he was not done with his investigation and that Maltais could not leave.

According to Maltais, at this point Agent Danley got a call on his radio and stepped away from the truck. Agent Danley then came back to the truck and told Maltais to put the truck keys on the passenger seat. Agent Danley then went back to his patrol vehicle. Agent Danley once again came back to the truck and asked Maltais to step out of the truck. Agent Danley then frisked Maltais and placed him in the back of the Border Patrol vehicle. Maltais stated this happened at approximately 1:00 a.m.

From this point forward, the facts are virtually uncontested. Maltais was placed in the back of Agent Danley's patrol vehicle. Agent Olson contacted Special Agent Chris Guyer in Minot to inform him that Agent Danley had stopped Maltais with the Dodge truck and Fleetwood trailer. As a result of previous intelligence reports and investigations, Agent Guyer believed that Maltais was a suspected member of the "Tetz Organization," a group which the Royal Canadian Mounted Police and the Canada Customs and Revenue Agency suspected was smuggling marijuana and currency into North Dakota from Manitoba, Canada. Agent Guyer also knew that on June 10, 2003, Maltais had been stopped at the Dunseith, North Dakota, Port of Entry with the exact vehicles in question here. Agent Olson was approximately 100 miles away when he first spoke to Agent Danley that evening. Agent Olson testified that he drove through Rolla, North Dakota at approximately 1:30 a.m. Shortly thereafter, Agent Olson requested the assistance of a drug dog. Numerous radio transmissions occurred while Agent Olson was enroute to locate and secure the assistance of a drug dog and handler. Agent Olson requested the assistance of a drug detecting dog from the Bureau of Indian Affairs Turtle Mountain Agency. BIA Officer Stacy LaRocque testified that he received a radio call from Agent Olson at approximately 1:30 a.m. requesting canine assistance. Officer LaRocque obtained approval from his supervisor to provide such assistance around 2:00 a.m. Officer LaRocque was in Belcourt which was 60 miles from the area where Maltais had been detained. Between 2:40 and 3:10 a.m., Agent Guyer, Agent Olson, Bottineau County Sheriff's Deputy Terry DeWitt and BIA Officers Stacey LaRocque and Officer Robert Hulett arrived at the scene. At approximately 3:00 a.m. Agent Olson identified Maltais as the same individual he had dealt with during the June 10, 2003, inspection of the truck trailer at the Dunseith Port of Entry. At approximately 3:15 a.m. Agent Olson asked Mal-

tais for consent to search the truck and trailer. Maltais denied consent.

At approximately 3:30–3:35 a.m., Officer Hulett conducted a sweep of the truck and trailer with his drug detecting dog, "Adar." The dog immediately alerted to the presence of contraband at the rear of the trailer and twice near the trailer's side door. Agent Danley opened the trailer's side entry door and saw several black duffel bags containing plastic vacuum-sealed bags filled with a green leafy substance that appeared to be marijuana. The agents also found signs of human foot traffic near the trailer which led to a fence running parallel to the United States and Canadian border. A strap from one of the duffle bags was found on the north side of the fence in Canada. Agent Danley then read Maltais his *Miranda* rights at approximately 3:55 a.m. Shortly afterward, Maltais and the vehicles were transported to the Bottineau Border Patrol Station.

Later in the afternoon of the same day, United States Border Patrol Agents executed a federal search warrant for the truck and the trailer. The search of the trailer revealed three hidden compartments in the floorboards. Numerous vacuum-sealed bags containing a green leafy substance were found in the compartments. The substance field-tested positive for the presence of marijuana. In total, 225.7 pounds of marijuana was seized. Maltais was subsequently charged with one count of possession with intent to distribute a controlled substance.

Maltais contends that his expectations of privacy were violated when he was detained and subjected to an overly intrusive vehicle stop and defacto arrest without the benefits of a warrant, probable cause, or reasonable suspicion.[1] The Government

responds by asserting that there was both reasonable suspicion and probable cause to detain Maltais during an investigatory stop and that as the events unfolded, there was probable cause to search the trailer and to ultimately arrest Maltais for possession of marijuana with intent to distribute.

## II. LEGAL ARGUMENT

From the facts set forth by the parties, the Court must determine (1) whether at some point the encounter between Maltais and Agent Danley changed from a consensual encounter to a seizure within the scope of the Fourth Amendment, (2) whether Agent Danley had a reasonable, articulable suspicion to conduct a *Terry* stop, (3) whether the scope and duration of the *Terry* stop were permissible, and (4) whether the subsequent search of the trailer was legal.

### A. CONSENSUAL ENCOUNTERS

 It is important to note that not all encounters between law enforcement officers and citizens constitute seizures which fall within the scope of the Fourth Amendment. *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "A consensual encounter between an officer and a private citizen does not implicate the Fourth Amendment." *Florida v. Rodriguez,* 469 U.S. 1, 5–6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984). The determination of whether an encounter between a police officer and a citizen falls within the regulation of the Fourth Amendment depends upon the unique facts of each case. *United States v. Jones,* 269 F.3d 919, 925 (8th Cir.2001).

A Fourth Amendment seizure does not occur merely because a police officer

---

1. In his Motion to Suppress, Maltais also sought to challenge the reliability of the drug detecting dog and the validity of the search of the truck and trailer. However, Maltais has since abandoned any challenge to the reliability of the drug detecting dog and the search of the truck and trailer.

requests permission to search an area or poses other questions to a citizen. Rather, a person has been seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

*Jones,* 269 F.3d 919, 925–26 (citing *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). "[T]he transformation of a consensual encounter into a *Terry* stop occurs only when the questioning is so intimidating, threatening or coercive that a reasonable person would not have believed himself free to leave." *United States v. Beck,* 140 F.3d 1129, 1135 (8th Cir.1998).

Here, there is no question that the initial contact between Maltais and Agent Danley was consensual. Consensual encounters, of course, do not implicate the Fourth Amendment. *Michigan v. Chesternut,* 486 U.S. 567, 574–576, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). There is no litmus test to determine when an encounter becomes a seizure. However, the Eighth Circuit has noted that circumstances indicative of such a seizure may include "officers positioning themselves in a way that limits the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication that the person is the focus of a particular investigation." *U.S. v. Johnson,* 326 F.3d 1018, 1022 (8th Cir. 2003) (internal citations omitted); *see also, United States v. Angell,* 11 F.3d 806, 809 (8th Cir.1993)(abrogated on other grounds).

In both Agent Danley's report and Maltais' affidavit, the facts show that Maltais approached Agent Danley first. Although Maltais and Agent Danley convey two different versions of the subsequent events leading up to Agent Danley placing Maltais in his patrol vehicle, both versions reveal that at some point Agent Danley instructed Maltais to wait in the truck. Assuming, as Maltais seems to contend in his affidavit, that Agent Danley's questioning was so intimidating, threatening or coercive that Maltais did not believe he was free to leave, the Court finds that once Agent Danley instructed Maltais to wait in his truck, the circumstances changed from a consensual encounter into a *Terry* stop.

### B. *TERRY STOP AND REASONABLE SUSPICION*

The Fourth Amendment secures the persons, houses, papers, and effects of the people against unreasonable searches and seizures by the government. *United States v. Jones,* 269 F.3d 919, 924 (8th Cir.2001). "It is well established that a roadside traffic stop is a 'seizure' within the meaning of the Fourth Amendment." *Id.* For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest. *Id.* Traffic stops are governed by the principles of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry,* the United States Supreme Court approved of a temporary seizure for investigation when a police officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." 392 U.S. 1, 30, 88 S.Ct. 1868. A law enforcement officer must have reasonable suspicion that criminal activity is afoot before an investigatory stop may be made. *Id.* at 21–22, 88 S.Ct. 1868. In deciding whether an officer had "reasonable suspicion," the totality of the circumstances must be taken into account. *Id.* The Eighth Circuit has summarized the standards used to determine whether reasonable suspicion exists:

The standard of articulable justification required by the fourth amendment for an investigative, *Terry*-type seizure is whether the police officers were aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[ed] suspicion that a crime [was] being committed." In assessing whether the requisite degree of suspicion exists, we must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion. "[T]he totality of the circumstances—the whole picture—must be taken into account." We may consider any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals. It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt, *id.,* however, the officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a "hunch" or on circumstances which "describe a very broad category of predominantly innocent travelers." In *United States v. Sokolow,* the Supreme Court observed that factors consistent with innocent travel can, when taken together, give rise to reasonable suspicion.

*Beck,* 140 F.3d 1129, 1136–37 (internal citations omitted).

Thus, the Court must consider whether Agent Danley had a reasonable, articulable suspicion that Maltais' vehicles were carrying contraband or that other criminal activity may have been afoot. This determination must be made in light of the totality of the circumstances. *See United States v. Pereira–Munoz,* 59 F.3d 788, 791 (8th Cir.1995)(holding that reasonable suspicion is determined in the totality of the circumstances); *United States v. Bloomfield,* 40 F.3d 910, 916–917 (8th Cir.1994)(en banc)(holding that reasonable suspicion is determined in light of the totality of the circumstances).

■■■■ As noted, for a *Terry* stop to be considered valid from its inception, the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, warrant that intrusion. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Factors that may lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence. *See Losee v. Dearinger,* 911 F.2d 48 (8th Cir.1990). When an officer develops a reasonable, articulable suspicion that criminal activity may be afoot, he may have justification for a greater intrusion unrelated to the initial stop. However, an investigative stop may only last so long as is necessary to conduct a reasonable investigation. *See United States v. Willis,* 967 F.2d 1220, 1224 (8th Cir.1992).

Maltais contends that Agent Danley did not have a reasonable suspicion to conduct a *Terry* stop and quotes *United States v. Dawdy,* 46 F.3d 1427 (8th Cir.1995) for support: "A report that a particular car is 'suspicious' simply does not indicate whether its occupants may be engaged in criminal activity." The quotation Maltais relies upon is taken from the dissent in *Dawdy,* but is found in the majority opinion in another Eighth Circuit case, *Thompson v. Reuting,* 968 F.2d 756, 760 (8th Cir.1992). Nevertheless, this case is distinguishable from the facts of *Thompson.*

In *Thompson,* the only information the officer had was that the police had received reports of a suspicious Chevy Nova in the vicinity of 48th and Sahler Streets in Omaha, Nebraska. The officer then stopped a brown Chevy Nova he saw at an

intersection on Sahler Street. The Eighth Circuit held that the officer did not have a reasonable, articulable suspicion to stop Thompson because "a report that a particular car is 'suspicious' simply does not indicate whether its occupants may be engaged in criminal activity." 968 F.2d 756, 760.

Here, Agent Danley had far more than just a citizen's report of a "suspicious vehicle." Even before Maltais approached Agent Danley during the early morning hours on August 8, 2003, in remote northern North Dakota, Agent Danley specifically knew that (1) a truck and trailer matching the vehicles at the side of the road had gone though an inspection at the Dunseith, North Dakota, Port of Entry on June 10, 2003; (2) the Bureau of Customs and Border Protection Inspectors found several hidden compartments in Maltais' trailer commonly associated with drug trafficking operations; (3) a truck and trailer matching this description were reported by a local farmer to be driving in this area in the early morning hours; (4) Agent Danley had been provided with background information concerning Maltais and the suspected drug ring originating in Canada or on the west coast; (5) roads in this area cross the United States and Canadian border where there are no designated ports of entry and these roads can be easily driven by almost any vehicle; (6) the truck and trailer had Canadian license plates; and (7) the location was within 500 yards of the United States and Canadian border.

From the constellation of facts outlined above, Agent Danley, or any other law enforcement officer, would have reasonably concluded that Maltais may have been up to no good. The totality of the circumstances was sufficient to lead any competent law enforcement officer to rationally suspect that criminal activity was afoot and to justify the initial stop. Under the

circumstances, it would have been extremely poor police work for Agent Danley to have simply done nothing. Agent Danley had, without question, an articulable, reasonable suspicion that Maltais was likely engaged in criminal activity and, as a result, properly detained him to further investigate his conduct. Agent Danley had a right to broaden his inquiry and to confirm or dispel his suspicions of criminal activity. The officer was entitled to rely on the information transmitted over intelligence reports, or other similar sources of information, to support his reasonable suspicion to believe that a crime would be or had been committed. As noted, prior to August 8, 2003, Agent Danley had been provided with considerable information concerning Maltais, his vehicles, and suspected drug smuggling operations on the border.

The Court is required to look at the totality of the circumstances and not just each independent fact standing alone. *See United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). The entire scenario of events raises a number of red flags and would lead any competent law enforcement officer to develop a reasonable, articulable suspicion and surmise that criminal activity may be afoot. The Court finds that these particularized, objective facts which, taken together with rational inferences from the facts, reasonably warranted suspicions that a crime was being committed. The Court expressly finds that Agent Danley had the reasonable, articulable suspicion necessary to conduct an investigative or *Terry* stop prior to any interaction with Maltais.

### C. *SCOPE AND DURATION OF TERRY STOP*

 As the Eighth Circuit has recently stated: "A *Terry* stop that is justified at its inception must also be sufficient-

ly limited in scope and duration." *United States v. Ramires*, 307 F.3d 713, 717 (8th Cir.2002). Once a motorist is lawfully stopped, law enforcement officers are entitled to conduct an investigation that is "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. 1, 20, 88 S.Ct. 1868. Eighth Circuit case law teaches that an officer may

> request the driver's license and registration, request that the driver step out of the vehicle, request that the driver wait in the patrol car, conduct computer inquiries to determine the validity of the license and registration, conduct computer searches to investigate the driver's criminal history and to determine if the driver has outstanding warrants, and make inquiries as to the motorist's destination and purpose.

*United States v. Jones*, 269 F.3d 919, 924 (8th Cir.2001)(citing *United States v. Beck*, 140 F.3d 1129, 1134 (8th Cir.1998) and *United States v. White*, 81 F.3d 775, 778 (8th Cir.1996)).

▮▮▮▮▮ The stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop. In addition, the officer should employ the least intrusive means available to dispel the officer's suspicion in a timely fashion. *United States v. Jones*, 269 F.3d 919, 924 (8th Cir.2001).

> A *Terry* stop may turn into an arrest if the stop lasts for an unreasonably long time or if officers use unreasonable force. During a *Terry* stop, officers can check for weapons and may take any additional steps that are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop. Officers must, however, employ the least intrusive means of detention and investigation, necessary to achieve the purpose of the *Terry* stop. In deciding whether to conduct a *Terry* stop, an officer may rely on information provided by other officers as well as any information known to the team of officers conducting the investigation.

*United States v. Navarrete–Barron*, 192 F.3d 786, 790 (8th Cir.1999) (internal citations and quotations omitted). In determining whether a detention following a lawful stop of a vehicle is reasonable, a court must consider both the length of the detention and the law enforcement officer's efforts to conduct an investigation in a quick and unintrusive manner. *United States v. Beck*, 140 F.3d 1129, 1134 (8th Cir.1998). An officer conducting a traffic stop may expand the scope of his investigation as reasonable suspicion dictates. *United States v. Gregory*, 302 F.3d 805, 809 (8th Cir.2002). The Eighth Circuit has specifically held that when the assistance of a drug dog is needed, it will generally take time to obtain one and noted that "local government police forces and the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times." *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir.1994). Further, the Court may consider any added meaning that certain conduct might suggest to experienced officers in the field trained in the observation of criminal activity, i.e., drug trafficking. *United States v. Jones*, 269 F.3d 919, 927 (8th Cir.2001). However, the officer's reasonable suspicion cannot be just a mere hunch or simply based on circumstances which describe a large number of presumably innocent travelers. *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980).

A review of the facts reveals that once Agent Danley began to ask Maltais questions about his immigration status, Agent Danley had even more objective facts that created a suspicion that criminal activity was afoot. According to Agent Danley,

Maltais gave questionable responses to questions concerning why he was parked on an isolated, gravel road at 1:00 a.m., less than 500 yards from the Canadian border in the middle of nowhere. Specifically, Maltais told Officer Danley that he had tried to cross the border at a Port of Entry that was closed. Maltais then told Officer Danley that he had traveled south on Highway 83 from the border and took a left turn onto a gravel road and traveled eastward on that gravel road to the location where he stopped to rest. Officer Danley said he became suspicious because the gravel road Maltais was found on did not cross the river east of Highway 83 and was not a continuous roadway from Highway 83 to where Maltais was found. In addition, Maltais was found approximately six miles from a paved road.

Rather than dispelling Agent Danley's initial suspicions, Maltais' own statements also created additional confusion as to when he in fact had last legally entered the United States. At this point, Agent Danley clearly had sufficient reasonable suspicion to detain Maltais long enough to determine his immigration status, in addition to his previous suspicions about the vehicle and trailer with hidden compartments *and* the location where he found Maltais, i.e., 500 yards from the Canadian border in an isolated, rural area of North Dakota, during the early morning hours, in a vehicle

previously suspected of being involved in drug trafficking.[2]

Shortly after Agent Danley finished his questions about Maltais' immigration status, he received a radio call from Agent Olson requesting that Maltais be detained at the scene until he could get there. Agent Olson had been present at the prior inspection of the trailer at the Dunseith, North Dakota Port of Entry, and had questioned Maltais for 1½ hours during the inspection. Agent Olson was also the officer to whom the local farmer had reported seeing the truck and trailer. Agent Danley then placed Maltais in his patrol vehicle and waited for Agent Olson. As noted, Agent Olson was approximately 100 miles away from the scene.

Maltais contends that once Agent Danley placed Maltais in his patrol vehicle, Maltais was under a "de facto" arrest which would have required probable cause rather than a reasonable suspicion. An investigative stop may become an arrest requiring probable cause if it lasts for an unreasonably long period of time. *See United States v. Miller*, 974 F.2d 953, 956 (8th Cir.1992). The Eighth Circuit has stated that confining a suspect in a police car is a factor that may weigh in favor of finding that an investigatory detention has turned into a formal arrest. *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994).[3] However, a law enforcement offi-

---

**2.** The Government also asserts that Agent Danley had the authority to civilly detain Maltais to determine whether Maltais was legally inside the United States. In light of the Court's above findings, it is unnecessary to determine whether there may have been some administrative authority for the detention.

**3.** In his brief, Maltais places great emphasis on the *Bloomfield* decision. The Court acknowledges that *Bloomfield* clearly identifies the length of the stop as a factor that should be considered when determining whether a *Terry* stop has turned into a de facto arrest.

However, in *Bloomfield*, the Eighth Circuit found a one-hour delay was not unreasonable under the circumstances. In addition, the Eighth Circuit opined that courts "must consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Bloomfield*, 40 F.3d at 917 (internal quotations omitted). The Court does not view the *Bloomfield* decision as dispositive of the issues presented here and notes that the decision appears to be more favorable to the Government's position.

cer's decision to confine a suspect in a patrol vehicle does not automatically transform an investigatory detention into an arrest. *United States v. Dickson,* 58 F.3d 1258, 1263–64 (8th Cir.1995).

In *Dickson,* the Eighth Circuit held that an officer's decision to detain a suspect in a patrol car until a witness could arrive to positively identify the suspect was reasonable and appropriate. 58 F.3d at 1263–64. The witnesses were nearby and arrived at the scene within approximately 15 minutes. *Id.* at 1263. It is well-established that during an investigative stop, officers may check for weapons and may also take any additional steps reasonably necessary to protect their personal safety "and to maintain the status quo during the course of the stop." *United States v. Hensley,* 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *see also United States v. Dawdy,* 46 F.3d 1427, 1430 (8th Cir.1995). "[O]bvious exigencies" allow the police to continue an investigative stop to stabilize a situation until they can determine whether full custodial arrest is warranted. *United States v. Lego,* 855 F.2d 542, 545 (8th Cir.1988). Actions by law enforcement officers that "maintain the status quo" and "stabilize the situation," pending the quickest means of investigation reasonably available to confirm the officers' suspicion, do not transform an investigatory detention into an arrest as long as the actions of the officers are not dilatory. 58 F.3d 1258, 1264.

The Court finds that the facts of the present case are analogous to the *Dickson* case. Here, Maltais was detained in the back of Agent Danley's patrol vehicle until Agent Olson could arrive at the scene. The Court acknowledges that this detention lasted between 1½–2 hours. However, given the time of the night of the detention (approximately 1:00 a.m.); the remote location of the detention at an isolated, re-mote, rural area in northern North Dakota near the Canadian border; and the distance other officers and the drug dog needed to travel to reach the scene (a range of from 60–100 miles), the Court finds that a delay of this length was not unreasonable. Had the detention lasted this length of time in Bismarck or in another area readily accessible to the other officers, the circumstances would probably not support a detention of this length. However, Agent Danley's actions simply "maintained the status quo" and stabilized the situation until additional officers and a drug dog could arrive at the scene during the early morning hours in the middle of nowhere. It was Agent Olson who was able to positively identify Maltais as the individual who had previously entered the United States with this same truck and trailer that included several hidden compartments under the floorboards of the trailer. It would have been extremely poor police work and incompetence to have done nothing and to have failed to take any steps to detain Maltais to further investigate the matter. Accordingly, the Court finds that Maltais was not under custodial arrest during the time that he was confined in the back of Agent Danley's patrol vehicle.

Maltais asserts that the officers exceeded the permissible scope of a *Terry* stop because he was detained for nearly three hours—from approximately 1:00 a.m. to 3:55 a.m.—before he was formally arrested. Maltais also asserts that he was subjected to an unnecessary delay because Agent Olson did not request a drug detecting dog until approximately 1:30 a.m.—a half an hour after the initial stop.

The Court is not convinced that Maltais was subjected to any unnecessary delays which amounted to an illegal seizure. Agent Olson arrived on the scene within approximately two (2) hours of when

Agent Danley first spoke to him. *It is of critical importance to note the time and the location where Maltais was found. This was in a very remote and isolated rural area in northern North Dakota, just 500 yards from the Canadian border, at approximately 1:00 a.m. in the morning.* The record does not reflect, nor does Maltais contend, that Agent Olson was purposefully slow or dilatory in getting to the scene. In fact, the record reveals that Agent Olson was 100 miles away and rushed to the scene as quickly as possible and made countless numbers of radio contacts with other law enforcement officers while enroute. While a wait of this length may not be tolerated under other circumstances, the Court finds that this length of time was not unreasonably long considering the time, the remote rural location, and the need for other officers to travel 60–100 miles in the middle of the night to reach the location in northern North Dakota.

The record reflects that, while in route to the scene, Agent Olson requested the assistance of a drug detecting dog which demonstrates an attempt to minimize the length of the detention. Once Agent Olson and the other law enforcement officers arrived at the scene at approximately 3:00–3:10 a.m., they completed their investigation within an hour. The Court concludes that the length of time it took the officers to conduct an investigative or *Terry* stop was reasonable under the circumstances. Common sense and ordinary human experience dictate that the officers involved diligently pursued a reasonable means of investigation designed to resolve their suspicion as quickly as possible. The Court believes that the officers acted reasonably and appropriately in detaining Mr. Maltais and that such actions "maintained the status quo" and "stabilized the situation" pending the quickest means of investigation. There is no evidence that any of the law enforcement officers were dilatory in their investigation or that there was any unnecessary delay.

## D. SEARCH OF THE TRAILER AND ARREST

 Although Maltais has abandoned his claim that the drug detecting dog brought to the scene was unreliable, a brief review of the search of the trailer seems to be in order. When Maltais refused to consent to the search of the trailer, Officer Hulett took his canine "Adar" around the trailer. The dog immediately alerted to the trailer. It is undisputed that when the dog alerted on the trailer, the officers had probable cause to search the trailer without a warrant. *United States v. $404,905.00 in U.S. Currency,* 182 F.3d 643, 647 (8th Cir.1999), *cert. denied,* 528 U.S. 1161, 120 S.Ct. 1175, 145 L.Ed.2d 1083 (2000). Once the marijuana was found in the trailer, there is no question that the officers had probable cause to search and arrest Maltais.

## III. CONCLUSION

Based upon the evidence presented and a careful analysis of the "totality of the circumstances," the Court finds that there are no grounds for suppressing the evidence seized during the search of Maltais' truck and Fleetwood trailer. From the totality of the circumstances, the Court finds that Agent Danley had the necessary reasonable, articulable suspicion to conduct an investigatory or *Terry* stop. The Court also finds that the stop and detention of Maltais lasted no longer than reasonably necessary to effectuate the purpose of the stop and that the officers used the least intrusive means available to dispel their suspicion in a timely fashion. Factors such as the time of day and the location of the stop contributed to the delay but were reasonable under the circumstances. Maltais was not detained for an unreasonable

length of time nor confined in an unreasonable manner.

The Court further finds that Agent Danley acted reasonably and appropriately in detaining Mr. Maltais until Special Agent Bernard Olson and other law enforcement officers arrived at the scene. That action "maintained the status quo" and "stabilized the situation" pending the quickest means of investigation reasonably available to confirm the officers' suspicions. There is no evidence that any of the law enforcement officers were dilatory in their investigation or that there was any unnecessary delay. Accordingly, the Court **DENIES** the Defendants' Motion to Suppress (Docket No. 31).

**IT IS SO ORDERED.**